## OLD COLONY RAILROAD CORPORATION *vs.* WILLIAM EVANS.

A vendor may enforce in equity the specific performance of a written contract for the sale of land.

A written contract, signed by one party and acted upon by both, may be enforced in equity against the signer, at the suit of the party who does not sign.

In an action at law by the vendor, to recover damages for the breach of a contract for the sale of land, the measure of damages is not the full contract price, but the difference between that price and the price for which the land could have been sold at the time of the breach.

Mutual mistake as to the quality of land, from which one party has agreed to dig gravel for the benefit of the other, is no ground for dismissing a bill in equity by the latter, for the specific performance of a subsequent written agreement, by which other land was substituted by the parties, after the discovery of the mistake, and the former agreed to pay for the first land.

A description in a written contract of " a certain tract of land, called Mount Hope, containing about forty acres, situated on the southerly side of N. River," may be shown by evidence of the acts of the parties to include a tract of seventy acres, known by that name to the parties.

A railroad corporation may maintain a bill in equity for the specific performance of a contract to purchase of them land which they have purchased for the purpose of having gravel dug therefrom, and transported at a certain freight over their road, to be delivered to and used by a third party.

BILL IN EQUITY to enforce the specific performance of a writ-ten contract. The bill alleged that the defendant, having agreed with the city of Boston to haul a large quantity of gravel on to certain "neck lands" belonging to the city, on the 14th of January 1848 entered into a written contract with the plaintiffs, by which they agreed to purchase "a certain tract of land, called Mount Hope, containing about forty acres, situated on the southerly side of Neponset River, in Quincy," and the defend-ant agreed to take gravel from Mount Hope, and convey it, in his own cars, over the road of the plaintiffs to Boston, paying therefor a specified toll; that, pursuant to this contract, the plain-tiffs purchased the tract of land, called Mount Hope, by two deeds, dated respectively the 8th and the 10th of April 1848, one of fifty eight acres, and the other of eleven acres, describing the premises particularly; and afterwards sold about ten acres thereof to N. Ward & Co., and located a branch railroad over another part; and the defendant began and continued to take gravel from Mount Hope, according to the contract, until he be-came dissatisfied with the gravel there, and made to the plain-tiffs the following proposition in writing:

"Boston, March 18th 1849. To the Directors of the Old Colony Railroad Corporation. Gentlemen: Being desirous to resume, as soon as may be, the delivery of gravel to the city, I propose to you to put on a gravel train forthwith, between your old gravel pit on the east side of your main track in Quincy and the neck lands in Boston, on the following terms, viz: 1st. Nothing in this arrangement shall in any way impair my con-tract with you to remove Mount Hope into Boston. 2d. I will remove from this pit, at a week's notice, whenever directed so to do by you, and will transfer the train to Mount Hope. 3d. The train from the old pit to be run, while continued, on the same terms and conditions as the Mount Hope trains. 4th. I will, whenever desired by you, put on a train from Mount Hope in addition. And I further propose to you, that if you will pur-chase or hire the Taylor Farm in Quincy, where three shafts have been sunk this week, and lay a turnout to such farm from the main line, I will accept the same as a substitute for Mount

Hope, and will pay to you the cost of Mount Hope, in three annual instalments, with interest, deducting the portion included in the location of the branch railroad, and the portion sold; and I will give security for such purchase; and the company to give me the benefit of the advance paid by N. Ward & Co.

"Wm. Evans."

The bill then alleged that the plaintiffs accepted this proposition, and gave the defendant notice of their acceptance; and, on the 29th of January 1849, purchased the Taylor Farm, and laid a turnout to it, and Evans accepted that farm as a substitute for Mount Hope, and abandoned work at the latter place, and commenced working at the Taylor Farm, and had since continued to work there; that they caused a deed to be prepared and executed, conveying to the defendant all of the tract of land called Mount Hope, except the portion sold and that included in their location, and tendered the same to the defendant for acceptance, and demanded of him to secure to them the payment in three annual instalments, with interest, of the amount which the tract so offered to be conveyed had cost them, which amount they averred to be $17,042.56; and that the defendant, after consulting counsel, refused to accept the deed. The bill then alleged the readiness of the plaintiffs, and the refusal of the defendant to perform the agreement.

The answer of the defendant, which is under oath, admits the making of the first contract; the purchase, by the plaintiffs, of a tract of land, "which the defendant knew as Mount Hope;" the sale of a portion of it, and the location of the plaintiffs' road over another part; but alleges that that contract was made by the defendant without any special examination of Mount Hope, to see whether it was gravel or not, and with only a general knowledge of the place, and without any knowledge of its exact boundaries, and in the belief that it contained just about the amount of forty acres, as specified in the contract; that the defendant was led, by the misrepresentations of the plaintiffs' superintendent, to suppose that the hill was gravel, and did not agree to dig any thing but gravel, or to take the hazard of the place proving to be any thing but gravel.

The answer then admits that the defendant went on for a time under that contract; but avers that, the hill proving not to be gravel, he was put to great cost and expense, to an amount, as he believes, greater than the cost of the place; and that, relying on that contract, he made an agreement with the city of Boston for the delivery of gravel, which, by reason of being so misled by the plaintiffs, he has been compelled to abandon.

The answer further admits his proposition to the plaintiffs; but avers that, at the time of making it, he did not know, and does not believe the plaintiffs knew, by the name of Mount Hope, any such territory as they now allege, but believed that about forty acres were contained under that name; and was told by the plaintiffs' president that, by the contract, the defendant was bound to take and remove Mount Hope, whether gravel or not, and that he made said proposal in the president's office, without any opportunity to consult counsel; that the proposition was never accepted by the plaintiffs, nor any notice of acceptance given to him; and that the plaintiffs never signed any writing by which they were bound to convey these lands to the defendant.

The defendant admits the tender of a deed to him, but avers that he was not bound to accept it, and that the plaintiffs have no legal or equitable right to require him to accept any deed of any part of Mount Hope, because of the matters already stated; and have no right to relief in equity, because, on their own showing, if they have any rights, they have ample remedy at law.

The plaintiffs filed a general replication.

At the hearing before *Thomas*, J., evidence was introduced upon the following points: Whether the contract of March 18th 1849 was accepted by the plaintiffs, and acted upon by both parties; whether the defendant was misled in entering into the contracts, or in his understanding of them, by the acts of the plaintiffs' agents, or any undue advantage taken of him by the plaintiffs; whether Mount Hope, as understood between the parties, included the whole or only a part of the tract purchased by the plaintiffs. The presiding judge reported the case

to the full court. The results of the evidence, so far as they are material to the understanding of the points of law decided, are stated in their opinion.

This case was argued at November term 1854.

*S. Bartlett & D. Thaxter*, for the plaintiffs.

*C. G. Loring & C. M. Ellis*, for the defendant. I. The court have no jurisdiction in equity of the case stated in the bill. The equity jurisdiction of this court in cases of specific performance, as in other cases, is limited by statute to cases where there is no adequate remedy at law. Rev. Sts. *c.* 81, § 8. The remedy at law is complete to recover the sum of $17,042.56, the recovery of which is the object of this bill. *Sears* v. *Boston*, 16 Pick. 358. *Salisbury* v. *Bigelow*, 20 Pick. 174. *Wilson* v. *Leishman*, 12 Met. 316. *Gill* v. *Bicknell*, 2 Cush. 358. *Jacobs* v. *Peterborough & Shirley Railroad*, 8 Cush. 225. *Shapley* v. *Rangeley*, 1 Woodb. & M. 213. *Stuart* v. *London & Northwestern Railway*, 1 De Gex, Macn. & Gord. 721.

II. The proposal to take Mount Hope was not accepted by the plaintiffs; and, not having been assented to by them in writing, was not mutually binding on both parties, and its performance will not therefore be specifically decreed. *Cabeen* v. *Gordon*, 1 Hill Ch. 51. *Benedict* v. *Lynch*, 1 Johns. Ch. 370. *Tucker* v. *Woods*, 12 Johns. 190. *Keep* v. *Goodrich*, 12 Johns. 397. *Geiger* v. *Green*, 4 Gill, 472. *Adams* v. *Townsend*, 1 Met. 483. *Lawrenson* v. *Butler*, 1 Sch. & Lef. 13.

III. The plaintiffs' case is not equitable. (1.) Because the hill not being gravel, (the material which the plaintiffs agreed to supply, and the only one which the defendant agreed to take,) the parties were under a mistake on a point vital to the whole contract, and ruinous to the defendant; and this mistake was induced by statements of the plaintiffs' superintendent. (2.) Because the plaintiffs took advantage of the position of the defendant, who had large amounts invested in cars, &c., and was bound to the city. (3.) Because the defendant's offer was only to take " Mount Hope," stated in the original contract, and understood by the defendant as " containing about forty acres." or, deducting the portion sold N. Ward & Co., thirty acres

3*

whereas the plaintiffs call on him to take sixty acres. And oral evidence is inadmissible to show that the defendant understood "Mount Hope" to include the larger amount. (4.) Because the plaintiffs, by their charter, have only the powers and privileges, and are made subject to all the duties, liabilities and provisions contained in the Rev. Sts. *cc.* 39, 44; and are authorized to construct a railroad, and to purchase and hold only "such real estate, materials, engines, cars and other things, as may be necessary for depots for the use of said road, and for the transportation of persons, goods and merchandise." *St.* 1838, *c.* 103, §§ 1, 2. They have no right to trade in gravel or land, and equity will not enforce the specific performance of such a contract. *First Parish in Sutton* v. *Cole*, 3 Pick. 232. *Bangor Boom Corporation* v. *Whiting*, 29 Maine, 123. *New York Firemen Ins. Co.* v. *Ely*, 2 Cow. 678. Angell & Ames on Corp. § 111.

DEWEY, J. 1. The general power of a court of chancery to compel the performance of specific contracts is unquestionable. It is clearly recognized in the elementary books and in the reported cases. It is directly given to this court by Rev. Sts. *c.* 81, § 8, in "all suits for the specific performance of any written contract, where there is not a plain and adequate remedy at law."

A recurrence to the books of authority on this subject will also fully show that the power of this court may be invoked, in this respect, as well in behalf of the vendor of real estate, as of the vendee; and, in all proper cases, the vendor may therefore come to this court, and obtain a decree in his behalf against his vendee, for the execution of a written contract made by the latter to purchase real estate. The English cases are abundant to that effect. But what is more directly an authority for this court, our own decisions show the repeated exercise of this power. *Salisbury* v. *Bigelow*, 20 Pick. 174. *Haven* v. *Lowell*, 5 Met. 35. *Hilliard* v. *Allen*, 4 Cush. 532. There may be open to the vendee a broader ground of defence against such a bill, than would ordinarily arise in the case of a vendee seeking to compel a conveyance by the vendor; but, in the absence of any good defence, the vendee is alike amenable to this process.

2. The next inquiry is as to the nature of the contract in the present case, and whether there is such want of mutuality in it, that the bill should be dismissed on that ground. The defendant relies upon the position, that unless both parties were so bound by the agreement that each could enforce it against the other, by a proceeding at law or in equity, there is no valid agreement upon which a specific performance can properly be decreed. This contract now sought to be enforced, it is conceded, was only signed by the defendant. If that fact shows such a want of mutuality as forbids maintaining this bill, then the bill must be dismissed. The defendant insists that such is the effect, and relies upon the following cases : *Benedict* v. *Lynch*, 1 Johns. Ch. 370. *Geiger* v. *Green*, 4 Gill, 472. *Lawrenson* v. *Butler*, 1 Sch. & Lef. 13.

If this written instrument, signed by the defendant, were to be considered in no other light than as a mere proposition to the plaintiffs, not acted upon by them, and not accepted, then clearly there would be no binding contract. But such is not the case ; the evidence showing clearly that, upon the execution of this writing by the defendant, the plaintiffs, agreeably to the terms and conditions therein stated, proceeded to hire the Taylor Farm for the term of seven years, with the right to take gravel there, paying for the use of the land for that purpose $10,800 ; that they permitted the defendant to use for a time the old gravel pit, and then to take gravel from the Taylor Farm. The plaintiffs therefore acted upon this promise of the defendant, and made large expenditures in performing the conditions and stipulations on their part to be performed as conditions precedent to the performance of the agreement on the part of the defendant. And the plaintiffs' acceptance of the proposal was known to the defendant, and he went into the occupation of the Taylor Farm.

[Here the judge referred in detail to those portions of the evidence upon which these conclusions were based.]

We do not understand that it is essential to the validity of a contract, required by the statute of frauds to be in writing and signed by the party, that each party should be alike bound to the performance of the contract, by his written signature thereto.

The statute itself only requires that " the promise or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith." Rev. Sts. c. 74, § 1.

The cases cited by the defendant certainly hold a different language, and, if good authority, would maintain his position. The case of *Lawrenson* v. *Butler*, in 1 Sch. & Lef. 18, affirms that view strongly, as does also *Geiger* v. *Green*, 4 Gill, 476. These cases, and that of *Benedict* v. *Lynch*, 1 Johns. Ch. 370, apparently of like bearing, have led us necessarily to a pretty full examination of the authorities upon this point.

In Chitty on Contracts, (8th Amer. ed.) 4, *note*, it is said " that a party may sue on a contract, although it be void as against himself for want of his signature, under the statute of frauds." The reason is more fully stated in the text as this : that the signature is prescribed rather as necessary evidence of the contract, than as an essential or constituent part of the engagement itself. On p. 17 of the same work, after stating that the assent must be mutual, and the agreement must, in general, be obligatory upon both parties, or it will bind neither, yet it is added : " A contract may not bind one party, in consequence of his omitting to sign it according to the statute of frauds ; and yet he may sue the other party who has complied with the act ; for, in this case, the objection merely goes to the evidence of the agreement." Again, more directly, on p. 355 : " It is sufficient that the defendant, whether he be the vendor or the vendee, has signed the contract ; and it is no objection that he has no remedy thereon against the plaintiff, inasmuch as the latter has not signed it." 2 Stark. Ev. (4th Amer. ed.) 614, and Roberts on Frauds, 124, state the same rule.

The weight of authority from adjudicated cases will be found fully to sustain the doctrine thus stated. *Egerton* v. *Mathews*, 6 East, 307, is to that effect. In *Allen* v. *Bennet*, 3 Taunt. 176, Mansfield, C. J. said : " Every one knows it is the daily practice of the court of chancery to establish contracts signed by one person only." *Douglass* v. *Spears*, 2 Nott & McCord, 207, holds the same doctrine.

The case of *Penniman* v. *Hartshorn*, 13 Mass. 91, is directly

to the point, that both parties need not be bound in writing
Parker, C. J. says : " The bargain was undoubtedly mutual,
although the parties might not have been equally vigilant in
obtaining the legal written evidence to prove it." *Barstow* v.
*Gray*, 3 Greenl. 415, holds it sufficient if signed by the party
sought to be charged.

But the case of *Clason* v. *Bailey*, 14 Johns. 484, is more par-
ticularly to be referred to, as containing a very full examination
of the authorities upon this question by Chancellor Kent, in
which he says the point is now too well settled to be further
questioned, though his earlier impressions were otherwise. He
also states, that the then Lord Chancellor of Ireland, Lord Man-
ners, had not followed the opinion of Lord Redesdale in 1 Sch.
& Lef. 18, but held the contrary, as will be seen in *Ormond* v.
*Anderson*, 2 Ball & Beat. 370.

It seems quite unnecessary to pursue the inquiry further; and
we will only add the cases of *M'Crea* v. *Purmont*, 16 Wend.
460, and *In re Hunter*, 1 Edw. Ch. 5, as fully confirming the
views of Chancellor Kent, and showing the decisions of the
courts of New York upon this question.

The result is therefore that there may be a mutual contract,
to which both parties have given their assent, though the evi-
dence of such assent may exist in a different form as regards
the two parties ; that, as to one, it may be verbal, while the other's
is expressed by his signature in writing, and that the latter may
be bound to perform his contract, while the first party might
avoid his by reason of the statute of frauds.

3. The next inquiry is, whether there exists, in a case like
the present, such plain and adequate remedy at law as to oust
this court of jurisdiction as a court of equity.

No doubt a remedy exists at law for breach of a contract to
purchase real estate. The only doubt is as to the extent and
perfectness of the remedy. It is said, on the part of the defend-
ant, to be fully adequate, because all that is or can be sought
by the plaintiffs is the payment of money, and courts of law
can render judgment for the full damages in money.

The reply to this part of the defence must depend upon the

view we take of the rule of damages in an action at law on such a contract. If it be held, as is supposed by the counsel for the defendant, that the vendee is to be charged with the whole amount of the purchase money in an action at law, if he refuses to perform such a contract, the result as to the damages would be the same as in proceedings in equity.

But we apprehend that that rule of damages, however applicable it may be to cases of contracts for the sale of personal property, where, by force and effect of a mere delivery, or by a judgment at law for the value of an article, the property may become vested in the party paying damages therefor, does not apply to real estate, which can only be transferred by deed. In actions against a vendee, on a contract for the purchase of real estate, we had supposed it to be a well settled rule, that, when a party agrees to purchase real estate at a certain stipulated price, and subsequently refuses to perform his contract, the loss in the bargain constitutes the measure of damages, and that is the difference between the price fixed in the contract and the saleable value of the land at the time the contract was to be executed.

The examination of the authorities upon this subject does not show an entire uniformity of views. The rule we have stated is said by Mr. Sedgwick to be the English rule. Sedgwick on Damages, (2d ed.) 190. See *Laird* v. *Pim*, 7 M. & W. 474, where this subject is much discussed. In *Alna* v. *Plummer*, 4 Greenl. 258, which was a contract for the sale of a pew in a meeting-house, it was held that, upon a tender of a deed, the vendor might recover the full price, though the other party refused to accept the same. The question was however apparently very little discussed. In some of the New York cases, as in *Franchot* v. *Leach*, 5 Cow. 506, it seems to be assumed that the vendor would recover the whole price agreed to be paid, if he was ready to fulfil the contract on his part. The English rule seems to be recognized in *Sawyer* v. *McIntyre*, 18 Verm. 27.

Several cases from our own reports are relied upon by the defendant, as sustaining the position that relief, in a case like the present, should be sought solely in a court of law.

The case of *Sears* v. *Boston*, 16 Pick. 357, arose upon a contract in which the defendants agreed to remove a bank of gravel from the land of the plaintiff, and pay him therefor at the rate of one dollar a square. The contract was only partially performed, and plaintiff brought his bill for a specific performance. Certain difficulties arose, preventing the performance of the work in the manner anticipated, and the defence was principally put upon a change of circumstances, and the court held that the specific performance of a contract was not to be enforced, " where, through inadvertence or mistake, or by the intervention of unforeseen causes, the performance becomes impossible or unreasonable." Although the court remark, in the opinion in that case, that " if the plaintiff had sustained any damages by the noncompletion of the contract, it might be fully compensated in damages," yet they do not intimate that those damages would be the entire sum agreed to be paid for the gravel.

The case of *Gill* v. *Bicknell*, 2 Cush. 358, more distinctly sustains the position that, in case of the tender of a deed by one party and a refusal by the other to receive it, the measure of damages would be the money stipulated to be paid for the land, and thus the party would have an adequate remedy at law in such cases. This was said however in a case where the court had already stated that the bill in equity could not be maintained, for the reason that no written contract had ever been executed by the defendant.

The case of *Jacobs* v. *Peterborough & Shirley Railroad*, 8 Cush. 223, was much to the same effect, and the suggestion was there made under similar circumstances as in the case last cited. The court there also had announced the opinion, that the case failed to show that the defendant had ever signed any contract agreeing to purchase the land. Having done so, they state as a further objection that the remedy at law would be complete, as the agreed price might be recovered in an action at law. In neither of these two last cases was this question essential to the decision.

Upon more full consideration of the question of the measure of damages in an action at law, where the defendant has refused

to receive the deed tendered him, the court are of opinion that the proper rule of damages in such a case is the difference between the price agreed to be paid for the land and the saleable value of the land at the time the contract was broken.

4. It is next insisted that the plaintiffs should not maintain this bill for a specific performance of the written contract, because it would be inequitable. This is a good ground of defence; for courts of equity will not decree a specific performance in cases of fraud, or of hard or unconscionable bargains, or where the decree would produce manifest injustice. 1 Story on Eq. § 769. But " where a contract respecting real property is, in its nature and circumstances, unobjectionable, it is as much a matter of course for a court of equity to decree a specific performance of it, as it is for a court of law to give damages for the breach of it." § 751.

The objection being open to the defendant, that the specific performance would be inequitable as respects him, it is incumbent on him to establish that fact. We therefore recur to his specifications relied upon to sustain such defence.

It is said that the parties were under a mistake as to the material to be found at Mount Hope; that the original agreement assumed that the hill was gravel. But it was a case of mutual mistake; and whatever excuse this mistake might have furnished for the defendant, if the plaintiffs had attempted to compel him to perform his contract to take gravel from Mount Hope, it is difficult to perceive how that can affect the present suit, seeking the specific performance of another and subsequent contract, made after the defendant well knew the real character of the material to be found on Mount Hope. The case discloses the fact, that the defendant had ceased operations upon Mount Hope before he made the written proposal to them of March 18th 1849, stipulating to take Mount Hope off their hands if they would hire the Taylor Farm for him, with the right to take gravel therefrom.

Nor do we see any ground for the suggestion, that the plaintiffs took advantage of the defendant's position, by reason of his investment in cars, and of his contract with the city of Bos-

ton.   The defendant deemed it for his interest to make this new arrangement, and the plaintiffs, upon the faith of his agreement, procured the Taylor Farm for his operations, thus enabling him to resume his operations, and to fulfil his contract with the city of Boston.

The only real question for consideration upon this part of the case is that as to the alleged misunderstanding of the defendant in reference to that stipulation in the contract, in which the defendant agrees to pay the plaintiffs " the cost of Mount Hope in three annual instalments, deducting the portion included in the location of the branch railroad and the portion sold." On the part of the defendant, it is insisted that the " Mount Hope" which he agreed to pay for was about forty acres, and that from this was to be deducted what had been sold to M. Ward & Co., whereas the plaintiffs required him to take and pay for about sixty acres.   If the facts had disclosed a case of clear mistake on the part of the defendant as to this, without any laches on his part, it would be a ground certainly for refusing the aid of this court to compel the execution of the contract.   In recurring to the original agreement made between these parties on the 14th of January 1848, it appears that they describe it as " a certain tract of land called Mount Hope, con- taining about forty acres, situated on the southerly side of Neponset River, in Quincy."   The description, it will be seen, was very general.   The conveyances to the plaintiff were made on the 8th and 10th of April following, giving particular bound- aries, and the whole containing about sixty nine acres.   The defendant, in his answer, states that he had only a general knowledge of the place, did not know its exact boundaries, and " was in the belief that it contained just about forty acres." In the answer of the defendant, he admits " that he believes it true that the plaintiffs did purchase a tract of land which he knew as Mount Hope," although he afterwards says he did not know that there were several purchases, and was informed that it contained about forty acres.   His written stipulation was " to pay the cost of Mount Hope," evidently embracing in terms the purchase of the plaintiffs.   But Mount Hope, as the defend

ant now describes it, would not embrace either of the purchases by the plaintiffs.

[Here the judge recapitulated the evidence, which, in the opinion of the court, proved that the whole of the land included in the two deeds to the plaintiffs was known by the defendant, before his proposal of March 19th 1849, as " Mount Hope," or ' Mount Hope Farm."]

Now, however the precise limits of Mount Hope may have been in the view of others, the more material question is, how was it understood by these parties in the contract of March 18th 1849 ? See *Gerrish* v. *Towne*, 3 Gray, 82. Was it not the Mount Hope, as purchased by the plaintiffs for the purpose of furnishing gravel to be taken away by the defendant ? Does not the language of the contract point to the entire purchase by the plaintiffs, rather than to any particular locality of a high hill? The proposition was to pay to the plaintiffs the cost of Mount Hope—the entire cost of their expenditure in this respect. We think it must have been so understood. The defendant was familiar with the general locality. He had taken gravel from both parcels ; from that included in the deed of April 10th, as well as the other. He had sufficient opportunity to have known the exact extent of the plaintiffs' purchase ; and agreeing, as he did, to take this purchase off their hands and assume it himself, if they would purchase the Taylor Farm, he must be bound thereby. It was, as we think, the Mount Hope, as purchased by the plaintiffs, that the defendant was to pay for at its cost, deducting the sale to Ward & Co. The defendant has not therefore shown any sufficient ground for excusing the nonperformance of his contract, by reason of any fraud or mistake.

5. Another objection taken to the maintenance of this bill was the want of corporate capacity to purchase and sell lands. The very general powers, which, under the principles of the common law, would attach to corporations, are much restricted by our special charters, or acts of incorporation for special purposes. We are to look at the nature and object of the incorporation, and determine, in the absence of any particular limitation, what are the incidental powers. Corporations clearly have power to

make all contracts that are necessary and useful to enable them to carry on the business, or accomplish the objects of their incorporation. The purchase of the land, the subject of the present bill, seems to have been made as a means of promoting the purposes of their incorporation—the increasing of their business in transportation upon their railroad—and not as an object of trade or speculation in lands.

We do not see any legal objection to the maintenance of the bill on this ground. See Angell & Ames on Corp. §§ 10, 11, 151, 153. *Plaintiffs entitled to specific performance.*