THE STATE ex inf. HADLEY, Attorney-General, v. STANDARD OIL COMPANY (of Indiana), WATERS-PIERCE OIL COMPANY and RE-PUBLIC OIL COMPANY.

**In Banc, February 26, 1906.**

1. **ATTORNEYS: Duties to Courts: Employment.** An attorney at law is an officer of the court, and as such it is his duty to assist the court in the due and orderly administration of justice therein. Even after employment, a client has no right to control his attorney in the due and ordinary course of a suit, but it is the attorney's duty to do what the court orders to be done, though his client instruct him otherwise.

2. ——: ——: **Notice to Witnesses: Personal Rights: Trust Statute.** No personal rights of an attorney employed by a corporation charged with being in a trust, combination, pool or monopoly against the anti-trust laws of this State, is invaded or transgressed by an order of court directing him to notify his client or non-resident witnesses in the employ of said client, to appear and testify and to produce books which show facts material to the issue, when request is made therefor by the Attorney-General in a quo warranto proceeding, as is provided by statute. Such statute simply provides a means for obtaining the attendance of non-resident witnesses, by notice to them through his attorney, and is in that respect in harmony with numerous statutes of Missouri, and when so construed, it impinges on the constitutional right of neither the attorney nor his client.

3. **FOREIGN CORPORATION: Notice: Laws Part of License: Trusts and Monopolies.** A foreign corporation cannot come into or transact business in this State against the State's will or without its permission. And when it is given license to do business in this State, a contract on its part to obey the legislative will is implied, and the laws expressive of that will, including the law requiring it and its non-resident officers and employees to appear and testify in suits affecting that license and its right to do business thereunder, upon notice through its attorney, must be read into the license.

4. ——: ——: **Combinations and Trusts: Materiality of Evidence: Ownership of Stock: Fraud.** In a *quo warranto* proceeding brought to oust three oil companies as being in an illegal combination, trust and pool, contrary to the anti-trust laws of this State, and alleging in substantive fact that two of them

are owned by the other, a showing of the ownership of the stock, as revealed by the books of the companies, and by witnesses, may be material and relevant. And especially is this true where the statute denounces such a combination to be a "conspiracy to. defraud," for in establishing fraud courts allow wide latitude and minute research.

5. ———: ———: ———: **Books: In Another State.** The fact that the books of one of the companies involved may be in New York, affords no reason why those books or an exemplified copy may not be produced for inspection.

6. **COMMISSIONER: Instruction by Court: Compelling Witness to Testify.** Where this court has appointed a commissioner to take evidence in a *quo warranto* case brought by the Attorney-General to oust certain corporations of their franchises as being in an illegal combination, this court will not undertake to instruct the commissioner as to what solicited evidence is competent, or whether or not the witness should be excused on the ground that his testimony might incriminate him, or on any other ground; but will leave the commissioner free to exercise his judicial judgment and if any error is committed by him it will be corrected on the hearing after his report has been made, as in other cases. The court will not inaugurate the practice of applying to it for instructions to a commissioner whom it has appointed and clothed with power to enforce his rulings, and thereby clothed with its confidence as possessed of unsullied integrity and proper legal learning to pass upon questions of testimony.

*Herbert S. Hadley,* Attorney-General, and *John Kennish* and *Rush C. Lake,* Assistant Attorneys-General, for informant.

(1) The constitutionality of sections 8983 and 8984, Revised Statutes 1899, is not now before the court for determination. From a consideration of the provisions of sections 8983 and 8984, it is clear that it was the intention of the Legislature to provide that service of the notice mentioned in these sections upon the attorneys of record should be service upon the respondent. The statute provides that the notice may be "directed to the attorney or attorneys of record in said cause, or any agent, officer or employee of any corporation, joint stock association or partnership which are parties to

said action.". There is no provision in the statute for the imposition of any penalty upon the attorney or agent of a corporation who may fail to notify the officer or representative of respondent, whose presence is desired, of the facts stated in the notice. The plain meaning and intent of the statute is to provide a method for serving the notice upon the party in the case by serving it upon its attorney of record, as is provided by the Code of Civil Procedure. Kelley v. Andrew Co., 43 Mo. 344; State ex inf. v. Continental Tobacco Co., 177 Mo. 42; Huyler v. Cragin, 42 N. J. 392; Mitchell v. Rubber Reclaiming Co., 24 Atl. 407. When the Republic Oil Company asked for and was granted a license to do business in this State, section 8983 had already been adopted. When it asked for the privilege of coming here it agreed to abide by the laws of this State. It was as clearly a part of that license as if it had been written there in terms that the Republic Oil Company would appear in court, in the person of such officer or representative as might have knowledge of the particular issues involved, should a suit be brought against it for violating the anti-trust laws of this State. The right of such agent to refuse to answer questions which might tend to incriminate him is not involved in this phase of the discussion. It is clearly the right of the State, under the exercise of its police power, to require a non-resident corporation to appear in the courts of this State through the only personality by whom it could appear—"an officer, agent, representative or employee," and to require it to appear in the person of that representative who has knowledge of the facts involved in the litigation. 6 Thomp. on Corp., sec. 7886; Attorney-General v. Bay State Mining Co., 99 Mass. 148; Clark v. Railroad, 81 Me. 477. The fact that this law does not make the same provisions in reference to an individual, or to resident corporations, is no argument against the constitutionality of the law. Ins. Co. v. Daggs, 172 U. S. 557. (2) Sections 737 to 741, Revised

Statutes 1899, provide a method for securing the production of books and papers in any court in this State in any civil suit that may be pending therein. The law in this State providing for the production of books and papers by the adverse party never has been restricted, or in any manner made conformable to the practice in courts of chancery. Terr. Laws, 1804-24, sec. 12, p. 111; Laws 1825, sec. 37, p. 631; secs. 7, et. seq., pp. 817-18, R. S. 1845; secs. 36, et. seq., pp. 1265-66, R. S. 1855; secs. 737, et. seq., R. S. 1899. (3) The subpoena *duces tecum* was properly served upon the officer of the Waters-Pierce Oil Company who had charge of the books and papers as such officer. (4) The witness, Adams, had no right to refuse to answer the questions asked him, except upon the ground that his answer might tend to incriminate him. The question was material because it sought to secure evidence tending to show the form in which the combination, trust and confederation of these respondents had been accomplished, and also to disclose facts which would prove the motive or reason why those things had been done by the respondents, as disclosed by the evidence in violation of the anti-trust laws. Kraus v. The Sentinel Co., 62 Wis. 664; State v. Faulkner, 175 Mo. 611. It is "abhorrent to the legal mind" to contend that the advice of a lawyer is a valid reason why an order or process of a court should be disregarded. McElree v. Darlington, 187 Pa. St. 593; State v. Butler, 47 S. C. 25; Osborn v. London Dock Co., 10 Exch. 698; In re Shera, 114 Fed. 207; State v. Wentworth, 65 Me. 234.

*Alfred D. Eddy, Frank Hagerman, Nagel & Kirby, John D. Johnson* and *Boyle & Priest* for respondents.

(1) The order to produce in this State the non-resident officers of the Republic Oil Company, and its stock book, can not and should not be enforced. 1st. Such an order is violative of the privileges accorded by

sections 11 and 23 of article 2 of the State Constitution. U. S. v. Boyd, 116 U. S. 616; Counselman v. Hitchcock, 142 U. S. 547; Lees v. United States, 150 U. S. 480; In re Pacific Railroad Commission, 32 Fed. 251; In re Hale, 139 Fed. 502. Whether the statute now under consideration was valid, was left undecided in State ex inf. v. Continental Tobaco Co., 177 Mo. 42, though the clear intimation was that it was unconstitutional. State v. Faulkner, 175 Mo. 606; In matter of Charles Green, 86 Mo. App. 220; People ex rel. v. Foundry & Iron Co., 201 Ill. 236; Thruston v. Clark, 107 Cal. 290; Logan v. Railroad, 132 Pa. St. 406. The practice in equity of compelling a discovery or the production of books and papers has universally been subordinated to the constitutional protection. Robson v. Doyle, 191 Ill. 570; 6 Ency. Pl. & Pr. 742; 30 Am. and Eng. Ency. Law (2 Ed.), 1158, 1159; Lester v. People, 150 Ill. 420; Logan v. Railroad, 132 Pa. St. 406; U. S. v. Lead Co., 75 Fed. 497. 2d. The enforcement of article 3 deprives the Republic Oil Company of due process of law. Pennoyer v. Neff, 95 U. S. 714; Wilson v. Railroad, 108 Mo. 597; In re Com. of Pennsylvania, 45 Misc. 46, 90 N. Y. Supp. 808. (a) But section 8984, authorizing judgment to be rendered in case of failure to produce these officers, is clearly violative of the protection to which one is entitled by the guaranty of "due process of law." Hovey v. Elliott, 167 U. S. 413; McVeigh v. U. S., 11 Wall. 259; Foley v. Foley, 120 Cal. 42; Greig v. Ware, 25 Col. 188. (b) The order of Judge Fox was, as the statute contemplates, made without any notice to the Republic Oil Company or its attorneys, and the order, if not complied with, carries with it the penalty of having judgment rendered against that company. This is not due process of law, and for this reason alone the statute is invalid. Windsor v. McVeigh, 93 U. S. 274. (c) Section 4 of article 2 of the State Constitution gives to all, even lawyers, the right to "the enjoyment of the gains of their own industry." Since the test oath cases

(Cummings v. Missouri, 4 Wall. 277; Ex Parte Garland, 4 Wall. 33) the profession of the law has been something that one has the right to pursue. An arbitrary demand for a lawyer to do something disconnected from the work of his profession is an exaction not to be tolerated and the legislation is as vicious as that condemned in State v. Loomis, 115 Mo. 313. (2) The commissioner cannot order the production of books and papers under sections 737,740 and 741. State ex inf. v. Continental Tobacco Co., 177 Mo. 37. (3) The books and papers of a defendant cannot be obtained by a subpoena *duces tecum* against an officer who, as such, holds such papers. In re Hale, 139 Fed. 496.

LAMM, J.—Original proceeding on information in the nature of *quo warranto*. The Waters-Pierce Oil Company is a domestic corporation. The Standard Oil Company of Indiana is a corporation of that State. The Republic Oil Company is a corporation of the State of New York. The two latter companies are domiciled for business purposes in Missouri by virtue of licenses issued to them under our statute, and upon compliance therewith. Each and every of these corporations was created for the purpose of engaging in the business of refining petroleum and buying and selling the products thereof and all are engaged in the business of selling naptha, benzine, gasoline, kerosene, lubricating oil and other products of petroleum in Missouri; not only so, but the said Standard Oil Company has established, owns and is conducting a refinery in this State and is refining petroleum thereat.

On the 25th of March, 1905, the Attorney-General commenced an original proceeding in this court in the form of an information in the nature of *quo warranto*, filed *ex officio*, against all of said corporations, thereby causing this court to be informed that said corporations had created, entered into and become members of a

pool, trust, agreement, confederation, combination and understanding among themselves and each other, to regulate, fix and control the prices to be paid by retail dealers and others in Missouri for naptha, benzine, gasoline, lubricating oil and other products of petroleum sold in this State, and to control and limit the trade therein and to control, limit and prevent competition in the buying and selling thereof between themselves and others engaged in like business, and to deceive and mislead the public into the belief that said respondents were separate and distinct corporations, each pursuing an independent business as legitimate competitors in the purchase and sale of said products of petroleum. Said information informing this court, furthermore, that said corporations by said pool, trust, combination, etc., had actually fixed and maintained the price of such products of petroleum so offered for sale by them in this State, and had controlled and limited the trade in such products, and had prevented and destroyed competition therein, and had deceived and misled the public into the belief that said corporations were separate and distinct corporations, pursuing their independent business as legitimate competitors in a legitimate business, although in truth and in fact they had entered into and were members of such pool, combination, trust, etc., and no real competition existed between them.

The information proceeds with due, legal precision and particularity to inform this court of the scope and tenor of the trust scheme and of the specific methods claimed to have been employed therein and thereby to rivet upon the people of this State, contrary to public policy and in the very teeth of express law, an alleged odious monopoly. For present purposes the inventory of details pleaded need not be set forth in this opinion. Suffice it to say that the substance and pith of the agreed plan and method, as gathered from the formal averments of the information, are, speaking figuratively and by way of comparison, that, as all Gaul was di-

vided into three parts (see the opening sentence of Caesar's Commentaries), and as the Roman world was parceled out in thirds in a certain historic domestic partition between Antony, Octavius and Lepidus presently after Caesar's death, so the State of Missouri has been divided into three parts by said corporations for the purposes of illegal exploitation and tribute—one part, chiefly north of the Missouri river, being assigned to the Standard Oil Company; another part, chiefly south of said river, being assigned to the Waters-Pierce Oil Company; and the other parts (varying from time to time in dimension and location as the alleged needs and whims of said trust may direct and point) being assigned to the Republic Oil Company— the novel and startling role played by the latter corporation, under the scheme outlined by informant and said by him to exist, being to act as a sort of wandering Ishmaelite, so to speak, with a name but no fixed local habitation, armed by the alleged trust with a roving commission to range up and down and to and fro only in such trade territory in Missouri as may have dealers in and consumers of such sundry products of petroleum, who refuse for any cause to deal with the Standard Oil Company or the Waters-Pierce Oil Company in their said respective tributary divisions of the State, and where competition perchance may have lifted its head, and there and then beat down the price of oils until such competition is smitten hip and thigh, as it were, and crushed out, whereby and wherefrom such recalcitrant dealers and consumers become mellow and subservient to and are made to pass under the yoke of the said general plan of trust exploitation.    Moreover, this court is caused to be informed that the Standard Oil Company by said trust agreement has agreed to sell and sells said products of petroleum only to the Waters-Pierce Oil Company, and Republic Oil Company, and through itself, and the Waters-Pierce Oil Company and Republic Oil Company have agreed to buy and do buy said products

of petroleum only from the Standard Oil Company. That by virtue of said agreement and the working plan adopted to effectuate its purposes, said corporations have monopolized eighty-five to ninety per cent of the current market supply of the said products of petroleum in Missouri and control the price thereof, and have secured the control of the oil business for the purchase and sale of oils in this State to the injury and damage of its people.

The object of this information is to oust the said corporations and each of them from their franchises, rights, authority, license and certificate to do business under the laws of this State and to forfeit the same.

On the filing of said information, straightway a rule was passed and handed down to show cause and to which said rule respondent corporations severally made answer and return. Respondents, the Standard Oil Company and the Republic Oil Company, made return by the same counsel and in common form (*mutatis, mutandis*) admitting their incorporation, charter, purposes and license and authority to do business in the State of Missouri as pleaded in the information. The Standard Oil Company also admitted that it had established and is now conducting a refinery in Jackson county, Missouri, for the purpose of refining petroleum and averred that it had spent many thousand dollars in the construction thereof. The said respondents further admit that they were doing business in the State of Missouri as venders of the products of petroleum as set forth in the information, but they generally, as well as specifically at length, deny, *seriatim,* the averments of the information having the sting of charging any illegal agreement, confederation and combination and the alleged plan and method of effectuating the same, etc. The Waters-Pierce Oil Company admitted its incorporation and business as a dealer in oil, as averred in the information, but denied all averments thereof charging the formation of a trust or any violation of law.

Thereafter, on May 3rd, 1905, this court made and entered the following order:

"Now on this day, it appearing to the court from the pleadings in the above-entitled cause that issues of fact are joined therein, therefore, upon motion and request of Herbert S. Hadley, Attorney-General, that a special commissioner be appointed by the court to take the testimony upon the issues joined in said cause, it is ordered by the court that Robert A. Anthony, Esq., of Fredericktown, Missouri, be and he is hereby appointed special commissioner to take the testimony upon the issues joined in said cause, with full power and authority to issue subpoenas, compelling the attendance of witnesses, the production of papers, books and other documents, to issue attachments therefor and to hear and determine all objections to testimony and to admit or exclude the same in the same manner and to the same extent as this court might in the trial of the case before the court, and to report the testimony, with his findings of fact thereon, to this court with convenient speed, provided that such report shall be filed by the first day of the October Term, 1905, unless further continued for good cause; exceptions to the findings of fact so made by said special commissioner to be filed by either party so desiring within ten days after the filing of the commissioner's report and findings."

Thereafter, the said Robert A. Anthony qualified as such commissioner and took upon himself the burden of doing and performing the matters and things nominated in his said warrant and chart of authority, and, prior to the report of testimony taken, rulings made and conclusion of fact arrived at by him, the Attorney-General filed with the clerk of this court the following application:

"Now comes Herbert S. Hadley, Attorney-General of the State of Missouri, who prosecutes this case for and in behalf of the State, and informs the court that C. L. Nichols, of 26 Broadway, New York City, is the

president of the Republic Oil Company, respondent herein, and that W. T. McKee, of Cleveland, Ohio, is the secretary and treasurer of said respondent; that the said C. L. Nichols and W. T. McKee are non-residents of the State of Missouri, and are without the jurisdiction of the court in which said cause is pending; that they are valuable, material and important witnesses for informant in said cause, and have in their possession certain books and documents which are material and necessary evidence on the part of the informant; that the testimony which said C. L. Nichols and W. T. McKee could and would give in this cause is in substance and to the effect as follows:

"That the firm of Schofield, Schurmer & Teagle was, prior to July, 1901, a copartnership, engaged in the business of refining petroleum and buying and selling the products thereof in various parts of the United States, and particularly in the State of Missouri, and that for long years prior to June, 1901, said firm of Schofield, Schurmer & Teagle were active and actual competitors in the State of Missouri of the Standard Oil Company of Indiana and the Waters-Pierce Oil Company, respondents herein; that during the month of June, 1901, the property and business of said firm of Schofield, Schurmer & Teagle was purchased by the Standard Oil Company of New Jersey, a corporation organized and existing under the laws of the State of New Jersey, and that said corporation owned at that time the stock of the Standard Oil Company of Indiana, respondent herein, and owned and controlled a majority of the stock of the Waters-Pierce Oil Company, a respondent herein; that after the purchase of the property and business of said firm of Schofield, Schurmer & Teagle by the Standard Oil Company of New Jersey, as aforesaid, there was organized in the State of New York a certain corporation, known as the Republic Oil Company, and that the stockholders who appeared in the articles of associa-

tion as the owners of the stock of said Republic Oil Company were Geo. B. Wilson, F. A. Turrell and James R. Turner; that each and all of said stockholders of said Republic Oil Company were employees of the Standard Oil Company of New Jersey, and of other corporations connected with the oil business, whose stock was owned by the Standard Oil Company of New Jersey, and that all of said stockholders were employed as clerks in a building located at 26 Broadway in New York City, which said building is known as the Standard Oil Building, and in which said building the Standard Oil Company of New Jersey, the Standard Oil Company of Indiana, the Republic Oil Company and the Waters-Pierce Oil Company have and maintain offices, agents and representatives. That said Geo. B. Wilson, F. A. Turrell and James R. Turner, who appeared as stockholders of said Republic Oil Company, did not own the stock of said company, said stockholders being mere clerks at a small salary in the employ of the Standard Oil Company of New Jersey, and subsidiary companies as aforesaid, but that said stock of said Republic Oil Company was and is now owned and controlled by the Standard Oil Company of New Jersey, the purchaser of the property and business of Schofield, Schurmer & Teagle, as aforesaid. That the object and purpose of transferring the property and business of the firm of Schofield, Schurmer & Teagle to the Republic Oil Company, and the object and purpose of incorporating the Republic Oil Company with the stockholders, as aforesaid, was in order that said Republic Oil Company might continue to carry on and conduct the business of Schofield, Schurmer & Teagle in various States of the United States, and particularly in the State of Missouri, as an independent and competing company in said State of the Standard Oil Company of Indiana and the Waters-Pierce Oil Company, and thus present to the public an appearance that it, said Republic Oil Company, was pursuing an independent busi-

ness as a legitimate competitor of said Standard Oil Company of Indiana and the Waters-Pierce Oil Company. That said purpose and object in the organization of said Republic Oil Company, and the transfer to it of the property and business of the firm of Schofield, Schurmer & Teagle has been carried out by said Republic Oil Company under the management, direction and control of said witnesses. That said Republic Oil Company does not compete for the business of said Standard Oil Company of Indiana and Waters-Pierce Oil Company in the State of Missouri, although said Republic Oil Company does pretend and claim to the public to be a competitor of said respondents. That said Republic Oil Company buys and receives the oil that it sells to the public from the Standard Oil Company of Indiana, and from no other person or corporation, and that the principal purpose and object accomplished by the business of said Republic Oil Company is to sell oil in the State of Missouri, in the territory assigned therein to the Waters-Pierce Oil Company, lying for the most part south of the Missouri river, as alleged in the information in this case, to such trade as will not, on account of prejudice or other reasons, buy of the Waters-Pierce Oil Company, and to crush out competitors of said Waters-Pierce Oil Company by temporarily reducing the price of oil to the purchasing public. That the same purpose and object and method of doing business is carried on and practiced by said Republic Oil Company in a certain territory in the State of Missouri, lying for the most part, north of the Missouri river, which is assigned to the Standard Oil Company of Indiana, as alleged in the information in this case.

"Informant further states that said C. L. Nichols and W. T. McKee are competent witnesses to testify to the facts herein set forth, which testimony informant is informed and believes, and therefore states to the court, that such witness can and will give, if they testify as witnesses in this cause.

"Your informant further states that said W. T. McKee has in his possession certain books, papers and documents, to-wit, the stock book of the Republic Oil Company, which said stock book will disclose the fact that said stock is owned and controlled by the Standard Oil Company of New Jersey.

"Wherefore, and by reason of the competent, material and important evidence possessed by said C. L. Nichols and W. T. McKee, informant states that he desires the appearance and attendance of said C. L. Nichols and W. T. McKee, and to take the testimony of said Nichols and McKee, and to introduce in evidence the said stock book of the Republic Oil Company in the court room of the St. Louis Court of Appeals, before the Hon. Robert A. Anthony, commissioner, appointed by the court to take the testimony in said cause, in the city of St. Louis, on the 18th day of October, 1905, between the hours of ten o'clock in the forenoon and five o'clock in the afternoon of said day, and if not completed thereon, to be continued from day to day until the same is completed.

"Informant states he knows of no witness or witnesses in the State of Missouri by whom he could prove the facts to which said witnesses could testify as fully as the same could be proven by the testimony of said witnesses, and informant believes that the testimony which said witnesses could and would give, as herein set forth, is true.

"Informant further states that he is ready and willing and hereby offers to deposit in court an amount of money sufficient to pay the necessary traveling expenses of said witnesses from their place of residence to St. Louis and return for the purpose of giving said testimony.

"Wherefore, said Herbert S. Hadley, Attorney-General, as aforesaid, requests and prays the Honorable James D. Fox, one of the judges of the Supreme Court of Missouri, to issue a notice in writing, directed

to Messrs. Frank Hagerman and A. D. Eddy, attorneys for respondents, the Republic Oil Company and the Standard Oil Company, and that a like notice, in writing, be issued to Charles Nagel, John D. Johnson and H. S. Priest, attorneys for the Waters-Pierce Oil Company, that the testimony of said C. L. Nichols and W. T. McKee is desired in said cause, and requiring the said Frank Hagerman and A. D. Eddy, attorneys of record of said Republic Oil Company, to have said C. L. Nichols and W. T. McKee, president and secretary, respectively, of the aforesaid respondent, the Republic Oil Company, at the place, on the day and at the time above set out, then and there to testify in said cause, and to require the said W. T. McKee to produce at said time the stock book of said Republic Oil Company.''

Thereafter, the following notifying order was made in the premises by Fox, J., in vacation:

"To Messrs. Frank Hagerman and A. D. Eddy, attorneys of record for the Republic Oil Company, and the Standard Oil Company of Indiana, and Messrs. Charles Nagel, John D. Johnson and H. S. Priest, attorneys for the Waters-Pierce Oil Company:

"You, and each of you, are hereby notified that Herbert S. Hadley, Attorney-General of the State of Missouri, informant in this cause, has filed with me, one of the judges of the Supreme Court of Missouri, in vacation, a petition in writing, setting forth the names of certain persons whose testimony he desires to take in the above-entitled cause, as well as certain books and documents which he desires to introduce in evidence, together with the time and place therefor fixed at the court room of the St. Louis Court of Appeals in the city of St. Louis, on the 18th day of October, 1905, between the hours of ten o'clock in the forenoon and five o'clock in the afternoon, and if not completed thereon, to be continued from day to day until the same is completed. That in said petition the Attorney-General states that he desires the testimony of C. L. Nichols, at 26 Broad-

way, New York City, and W. T. McKee, of Cleveland, Ohio, who are, respectively, president and secretary and treasurer of the Republic Oil Company; that said persons are non-residents of the State of Missouri, in which said cause is pending; that they are valuable and material witnesses for the informant, as is more particularly set forth in said application; that said McKee has in his possession the stock book of said Republic Oil Company, which will be competent and material evidence in said cause, as is more particularly set forth in said application.

"Now, therefore, in accordance with the provisions of section 8983, Revised Statutes 1899, these presents are to command you, the said Frank Hagerman and A. D. Eddy, and you are hereby required to produce the said C. L. Nichols and W. T. McKee and have them at the place and on the time hereinbefore set out, then and there to answer such competent, legal and material questions as may be put to them touching their knowledge of the issues in the above-entitled cause and you are further required and commanded to have the said W. T. McKee produce and present in evidence at said time and place mentioned the stock book of the said Republic Oil Company. A copy of the petition, filed by informant, is hereto attached, of which you will take due notice.

"Given under my hand this 28th day of September, A. D., 1905.

"James D. Fox,

"Judge of the Supreme Court of Missouri."

Thereafter, at this term, the following motion was filed in this court by Messrs. Hagerman and Eddy, directed to said order and notice:

"Now comes Frank Hagerman and A. D. Eddy, who are counsel of record for the respondents, the Republic Oil Company and Standard Oil Company, of Indiana, in the above-entitled cause, and move the court

to set aside the order made and notice signed by James D. Fox, a judge of this court, on September 28, 1905, in response to the petition of the Attorney-General, requiring them to produce before R. L. Anthony, commissioner herein, C. L. Nichols and W. T. McKee at the time and place set out in said order and notice, and to produce the document demanded by informant, as specified therein, for the following reasons:

"First: Said order was improperly and improvidently granted.

"Second: Because they, and each of them, bear no relation to either of said respondents other than that of attorneys and client herein, and such relation does not impose upon them the duty of having the witnesses named, or the book specified in said order and notice before the commissioner at the time named or at any other time. Alfred D. Eddy is an attorney at law residing in Chicago, Illinois, and having no business in this State other than as an attorney in this cause, while Frank Hagerman is an attorney at Kansas City, Missouri, having no connection with the said respondents except as attorney and client in this case.

"Third: Because said attorneys of record of the said Standard Oil Company of Indiana and of the Republic Oil Company have no power, authority or jurisdiction over the said C. L. Nichols and W. T. McKee, or either of them, to compel the attendance of either of said witnesses named at the place named in said notice and order, or elsewhere, to testify before said commissioner.

"Fourth: Because the document named in said order and notice is not and has never been in the possession or under the control of either said Eddy or Hagerman, or are they, or either of them, required by said notice to attend before the commissioner as witnesses. This proceeding is based and founded upon article III, chapter 143, of the Revised Statutes of Missouri of 1899, which does not contemplate an order to produce

by the court, or other officer authorized to take evidence, upon any other person than an officer, director, agent or employee of the Republic Oil Company, which order can only be made upon such witness whose attendance has been procured to testify before the tribunal authorized to take the evidence.

"Fifth: Because it was and is beyond the power of this court to require of these attorneys the duties of serving process for the purpose of procuring the attendance of informant's witnesses in the cause, thus taking the time, labor and expenditure of the attorneys to procure witnesses on behalf of the State, without any compensation being made therefor, and compelling the attorneys to perform duties antagonistic to the interests of their client, and the production of evidence against their client and in favor of their adversary.

"Sixth. Because the statute under which said application is made does not apply to proceedings by information in the nature of *quo warranto* , but applies solely to actions commenced by the Attorney-General or some prosecuting attorney by the direction of the Attorney-General, in equity, in the circuit court of this State, and does not confer power, authority or jurisdiction upon the court to order the production of witnesses, or books and papers before the commissioner.

"Seventh: Because said statute under which said application is made is in contravention and violation of sections 11 and 23 of article 2 of the Constitution of Missouri.

"Eighth: Because the said statute is in contravention and violation of section 53, article 4, of the Constitution of Missouri.

"Ninth. Because said statute is in contravention and violation of the fourteenth amendment to the Constitution of the United States, in that it condemns without due process of law, and in that it denies to the defendant the equal protection of the law, and discriminates between resident and non-resident persons and

corporations.

"Tenth. Because the said statute is an attempt to secure the evidence of witnesses from without this State, by constructive service, and without providing compensation to said witnesses for their time and expenses, and thus deprives them of their property without just compensation, and also deprives the respondent and its attorneys of any compensation for the service and expense of procuring the attendance of such witnesses, books and papers.

"Eleventh. Because said statute is an unlawful attempt to extend the process to be issued thereunder beyond the territorial limits of this State.

"Twelfth. Because said statute is in contravention and violation of section 25, article 2, of the Constitution of Missouri, in that it inflicts cruel and unusual punishment by depriving the respondent of its constitutional right to be heard in its defense of informant's action, for the default, omission or contempt of another over whom said respondent has no power or control to compel attendance.

"Thirteenth. Because by the laws of the State of New York, under which the respondent, the Republic Oil Company, is organized and incorporated, it is required to keep its stock books in the State of New York, and has no power or authority to bring the same into the State of Missouri, and cannot do so without violating the laws of the State of its creation.

"Fourteenth. Because the order was made upon an ex parte petition of the Attorney-General without any notice to any attorney or any respondent in this cause."

Which said motion was sworn to severally by said attorneys.

Supplementing said motion, another in the same form was filed by Messrs. Johnson, Nagel & Kirby, and Priest, attorneys for Waters-Pierce Oil Company.

The contentions bodied forth in these motions were

argued orally by learned counsel with entire felicity and are anew presented in briefs taking a wide play in statutory, common and constitutional law. In passing, it may be said that other matters pending before the special commissioner and referred by him to us, certainly by consent of counsel and possibly on their implied request, or tacit suggestion, were also argued at the same time and find place in said briefs and we are invited to deliver a pronouncement upon them. However, it is thought best to separate the consideration of questions arising before the commissioner, and by him certified here, from the consideration of those questions arising on the motions to vacate the order of Fox, J., and, for the present at least, to consider the latter as distinct from all others.

I. Broadly speaking, the motions strike at the power of this court to lay upon the shoulders of counsel the duties and burdens shadowed forth in that order and to thereby credit them with the result of obedience, on one hand, or charge them with the result of disobedience, on the other. It is true it will be seen that a subsidiary or minor assault is made upon the order upon behalf of respondents, but, nevertheless, the major note, the very gist of the pleading, is directed to an insistence personal to counsel and, inasmuch as this is so, we may be permitted to defer to them by adopting their theory that the large question presented is as stated.

Should the order be vacated? We think not, and this for the following reasons:

(1) It being always permissible to look to the principles of general law for the governing reasons of a given statute, it will prove neither amiss nor uninstructive, before coming to a close view of the particular statute involved and presently to be considered, to recall certain hornbook propositions, viz.: the relation of attorney and client is not commonly, if ever, regulated in its distinguishing characteristics and earmarks

by express contract. Such relation arises by mere employment and the relation itself, being one of high confidence, delicacy, power and intricacy, its scope, duties, powers and incidents are controlled and fixed by certain principles of general law which must be read into the contract of the employment in order to clothe it with due and sensible life and color. For instance, an attorney at law is, first of all, an officer of the court. As such officer, and not otherwise, he moves and lives and has his being. His very authority to pursue his historic and honorable profession springs from an act of the law and of the court and may be terminated by the same authority, and his duties are circumscribed and prescribed by law. In the due and orderly administration of justice through the courts it is the duty of an attorney at law to assist the court. If *rectus in curia,* he is by the same token *amicus curiae.* In performing his duties as an officer of the court and under its eye and direction, such duties within reasonable bounds are not extraordinary or illegal or unnatural ones, but, to the contrary, are ones of honor and responsibility, inherent in the very office of an attorney at law, and are related to due process of law and recognized legal procedure. A trite illustration of the reciprocal duty of the court to command and of an attorney to obey has long been found in our statute and is of everyday use. Thus, our Bill of Rights provides, section 22, that in every criminal prosecution the accused shall have the right to appear and defend in person and by counsel. The statute provides, section 2560, that, in case of an arraignment under indictment for felony, if one be unable to employ counsel, the court shall assign him counsel at his request. Would counsel, so assigned, be at liberty to eschew the assignment or avoid the labor because of whim or caprice or because of an inherent lack of power in the court to place such burden of responsibility and labor upon them? The question answers itself.

Even after employment, a client has no right to control his attorney in the due and ordinary conduct of a suit, but it is the attorney's duty to do what the court would order to be done, though his client instruct him otherwise (3 Bl. 165, Sharswood's note) although ordinarily an attorney must obey the lawful instruction of his client. So, too, for certain purposes, for instance in the matter of notice, an attorney, once he is employed in a given civil suit, stands for that turn and to some extent in the shoes of his client. It is in recognition of this theory that our Legislature proceeded in enacting the statute permitting a notice of an appeal from a justice court to be served upon an attorney (sec. 4074); in permitting notice for taking depositions to be served upon an attorney (sec. 2885); and in allowing notices, orders and rules made and passed or required in the progress of a civil case to be served upon an attorney of record therein. [See Code of Civil Procedure, sec. 586.] Also in permitting notice of an application for a change of venue to be given to an attorney (sec. 822); and in permitting notice of suing out a writ of error to be given to an attorney (sec. 852).

Reference might be made to other living cognate enactments for similar provisions to illustrate the point in hand. Such has always been our legislative policy. Take, for example, an illustration from our abandoned statutes, so pertinent as to be on all-fours. When a bill of discovery was allowable in accordance with the usages of chancery practice, a litigant desiring a discovery might present a petition to the court or judge in vacation, setting forth the matters upon which his claim to the discovery was founded, the facts sought to be discovered and such interrogatories in relation thereto as he shall think necessary to exhibit in order to attain a full discovery. Thereupon the court or judge in vacation might grant an order requiring the party from whom the discovery was sought to answer the interrog-

atories exhibited in the petition. This petition and order to answer were required to be filed in the office of the clerk of the court and a copy thereof served on the other party or *his attorney.* [R. S. 1845, pp. 818-19.]

Again: the rules of this court, covering matters of gravity and solicitude to litigants, are constructed on the theory that notice in a given instance may be given to an attorney of record and thereby bind his client and be made to answer all the practical ends of justice.

It is in the light of the foregoing established legal principles and pregnant illustrations of grounded legislative policy that we must approach the consideration of section 8983, the same being a part of our anti-trust statutes and being the section under which the application for the order assailed was made and upon which it is based.

(2) Coming to the section in question, it provides that when the Attorney-General has commenced proceedings, such as heretofore indicated, under the laws against the formation and maintenance of pools, trusts of any kinds, monopolies in commodities, or combinations or organizations in restraint of trade, etc., and he desires to take the testimony of any officer, director or employee of any corporation proceeded against, and the individual or individuals whose testimony is desired are without the jurisdiction of the courts of this State, or reside without the State of Missouri, then he shall file in the court where the proceeding is instituted in term time or in vacation, or with any person duly authorized to take the testimony in such case, a statement in writing setting forth the name or names of persons or individuals whose testimony he desires to take, etc. Thereupon the court, or one of the judges thereof, etc., shall issue immediately a notice in writing directed to the attorney or attorneys of record in said cause notifying said attorneys of record that the testimony of the person or persons named in the application is desired,

and "requiring" said attorney, to whom said notice is delivered, "to have" said officer, agent, employee or representative at the place named in the application at the time fixed, then and there to testify. The section ends significantly as follows: "Provided, also, in addition to the above-named time, six days shall be allowed for the attorney of record . . . *to notify the person or persons whose testimony is to be taken.* . . ." Some of the language used is inapt and lacking in legal precision—a case of "thundering in the index"—but the whole section, fairly and benignantly construed in the light of the reasoning heretofore employed and in the light of the legislative policy evidenced by said illustrations, shows that it was meant thereby to provide a means of notifying a defendant through his attorney of record. In other words, the Legislature, in legal effect, provided that notice to an attorney of record should be notice to a client in the particular in hand. And that, in our opinion, is all it does mean, and if we are right in this, its force is spent on the question of notice. So construed, it is not out of line with the many provisions of our law hereinbefore cited, nor out of line with the underlying theory that an enrolled attorney is an officer of the court and may have duties assigned to him as such officer. If the statute had provided or the court had ordered that one of its attorneys should, *vi et armis,* or say, by stratagem, procure the bodily presence of a given person in court at a given time and place, *will ye, nill ye,* or, if we may be allowed a fanciful speculation, if the court or statute should require one of its attorneys as an officer to perform certain manual labor quite disconnected from the practice of the law (for instance, to saw a cord of hickory wood daily) or to appear in public in an outlandish or in an archaic dress—for instance, with a cocked hat, sword and knee-breeches— then it might be urged with plausibility that such order of law imposed an unnatural and undignified and illegal burden upon him and infringed upon his personal

rights as an American citizen and gentleman. But orders of court requiring an attorney to address the court standing, or to compress his remarks within a given time, or laws providing that he shall notify his client of a certain order or of a certain notice that is served upon him in the case in which he is employed, are not amenable to the criticisms visited on the section in question by the motions under consideration.

If we may not be allowed to adopt the quaint conceit, once indulged in, that the idea of monopoly may have originated in Joseph's corn and land dealings in Egypt (Gen. chap. 41; *Ibid.* 47, *q. v.*), or the no less playful conceit of a certain ecclesiastical scholar to the general effect that illegal trusts were hinted at in Rev. 13:16-17 (q. v.), yet we feel at least on solid ground on the proposition that statutes leveled against monopolies are buttressed upon the wisdom of the common law, and this court, constrained and enlightened by events of current history, is not required and does not deem itself invited to approach the interpretation of such statutes with a hostile or sour predisposition to drive a coach and six through them, but, on the other hand, while sedulously protecting the rights and liberties of the individual from insidious approaches under whatever artful guise, we should at the same time not lose sight of the rights of the community and should endeavor to advance the beneficent purpose underlying such laws (State ex inf. v. Armour Packing Company, 173 Mo. 356), where it can be done without doing violence to constitutional provisions; and in our opinion no constitutional provision is impinged upon by the law providing for such notice nor by the notice itself, so far as it relates to the means employed in procuring the attendance of witnesses.

In arriving at this conclusion we are somewhat influenced by several other propositions. For example, while for certain purposes a corporation is deemed a

person and entitled to the benefits of any law regulating the rights of a person, yet this is only *sub modo,* because for other purposes such artificial entity occupies a peculiar position in the law. Thus, unlike a natural person, it may not go into another State and transact business without the permission or against the will of such State. [Hooper v. California, 155 U. S. l. c. 652, and cases cited; Orient Insurance Co. v. Daggs, 172 U. S. l. c. 566; Daggs v. Ins. Co., 136 Mo. l. c. 391.]

It logically results from this recognized doctrine that a State may withhold or regulate and grant license to do business under legislative restrictions, not inimical to the Federal prerogative relating to interstate commerce or other high Federal governmental function. It is but taking one step further in the evolution of the argument to hold, as we do, that when a corporation, having no right to come into a State, other than that of its own creation, for business purposes, except by virtue of its license and the expressed legislative will of the State so invaded, does come into such sister State under a license, as in this case, a contract to obey existing laws pertaining to the granting of that license and the right to hold under that license is implied. In this view the law must be read into the license, and in this view it is not going too far to hold that when the Republic Oil Company of New York was granted and accepted a license to do business in Missouri, it agreed and contracted with this State that notice to appear and testify in any suit affecting that license or the right to do business thereunder, served upon its attorney of record in that case, should be deemed and taken as due notice to the corporation. This is well within the reasoning of Daggs v. Ins. Co., 136 Mo. l. c. 398-9, and other cases that might be cited.

Nor does it seem laying an unfair burden upon such corporation to require it to produce its specified officers and agents at a reasonable time and suitable place within this State to give their testimony in such

cause. And this is so, because a corporation by virtue of its infirmity as an artificial person can testify in court, or, otherwise, can speak or act, only through officers or agents in ordinary transaction in matters incident to its business affairs. Like the man under authority, who had soldiers under him, it says to one of these agents or officers, go, and he goeth, to another, come, and he cometh, and to its servant, do this, and he doeth it. By virtue of such commands its officers and agents fetch and carry. They come into a State and establish a business and thereafter shape and control it. If, then, the voice of its over-lord, its real paramount master, which master it must not be forgotten is the law itself, requests of it the presence of one or more of its officers or agents, for the solemn and just purposes of the law, it cannot be said as a matter of *a priori* reasoning that it is at liberty to refuse to do for the law what it is constantly doing for itself, *sua sponte,* to-wit, send such officers or agents within the jurisdiction of the courts of this State.

The immediate question now up for consideration seeks only the right of the State to lay such duty upon the corporation and the duty of the corporation to respond to such order. In this condition of things the constitutionality of section 8984 is bitterly assailed. The section provides that if such officer or agent, etc., do not appear to testify and do not produce whatever books and documents be ordered produced by the court, or by the officer authorized to take such evidence, then it shall be the duty of the court upon the motion of the Attorney-General to strike out the answer, motion, reply, demurrer or other pleadings, then or thereafter filed in said action or proceedings by said corporations whose officer or agents, etc., is in default and proceed to render judgment by default against said corporation. But in the view we take of this matter the constitutionality of section 8984 is prematurely raised. No concrete controversy is presented on that section for our consid-

eration and it is believed that it would be an unwise *obiter* for us at this time to consider the mere academic question of what would or should legally follow if such officer or agent, so in good faith ordered by the corporation to appear, of his own will and thereafter chose to disobey such order. No such disobedience is before us. The Attorney-General has neither filed a motion based on such disobedience nor could he do so in the present state of the controversy. We will, therefore, not consider what may happen if such corporation place itself in the attitude of wilful default. Nor will we now consider by way of anticipation whether the master of such defaulting servant, who may show itself to have done all it could do to procure his attendance and who may have discharged such unfaithful agent or officer for his disobedience withal, should be punished without its own fault for the mere default of another—all these questions are not before us at this time and will not be passed upon.

The matter of the reasonableness and constitutionality of section 8983 and those immediately following, was before us in State ex inf. v. Continental Tobacco Co., 177 Mo. 1, and while this court did not pass upon such constitutionality in that case, yet, *arguendo,* such constitutionality was conceded and the whole question rode off on the definiteness of the application and the order and their showing of materiality in the testimony and the competency of the witnesses. [Pp. 42-3.] Comment, too, was made upon the fact that the expenses of the witnesses were not tendered or provided for in that case. In this case the Attorney-General has offered to deposit in court such expenses. In this case, too, the materiality of the evidence is set forth with a wealth of precision and detail. Nor have we any doubt upon the competency of the witnesses to testify under the showing made in the information and in the application and order.

Howbeit, if it should happen, when such witness

appears, that questions are propounded which, under oath, the witness declined to answer because, forsooth, it was claimed by the witness, under oath, that his answer would tend to criminate him, and if our commissioner rule thereon and if on his final report here exceptions be made to such ruling, or to the evidence elicited, or if such commissioner commit the witness for refusal and a writ of *habeas corpus* be sued out, then, and for the first time, the precise question would arise which counsel have sought to inject into this hearing, but which we do not consider lodged here now. We will not assume that such questions will be asked, nor will we assume that the witness under oath will assert such privileges, nor will we assume that our learned commissioner is not well equipped to judicially dispose of such questions as they rise at the hearing before him, or that he will err in the first instance, unless guided by a pronouncement from us in advance.

In putting the matter to one side it will not be amiss to say, however, that at first blush it would appear that our Legislature had attempted to provide an immunity for such witnesses in order to coerce their testimony; for having provided in a prior section, 8972, as follows: "Provided, that no statement made by any person in any affidavit made under provisions of sections 8973 and 8974 of this article shall be competent as evidence against such person in any criminal prosecutions brought under this section," the legislative mind again recurred to the matter in section 8974, as follows: "Provided, that no corporation, firm, association or individual shall be subject to any criminal prosecution by reason of anything truthfully disclosed by the affidavit required by this article, *or truthfully disclosed in any testimony elicited in the execution thereof.*"

In this connection it may also be well to notice State ex rel. Attorney-General v. Simmons Hardware Co., 109 Mo. 118, which is cited and somewhat relied

upon by respondents. That case was a proceeding against the Simmons Hardware company under a statute passed in 1889 (Laws 1889, p. 96). Such statute was classified by the Legislature as pertaining to "Crimes and Criminal Procedure." It had penalized sections providing for fines and imprisonment, and, with no immunity provisions, sought to coerce evidence from the president, secretary or treasurer of the corporation. At the October term, 1891, of this court, section 6 of the act was held unconstitutional. But, in the meantime the entire act was repealed and a new statute enacted which, with certain supplementary and amendatory legislation, now comprises arts. 1, 2, 3, and 4 of chapter 143, Revised Statutes 1899. The immunities offered by these latter statutes seem quite broad and deep and, moreover, seem somewhat to obviate the objections considered in State ex rel. v. Simmons Hardware Co., *supra,* which case must be read in the light of the canon of construction that the facts in judgment are to be considered as well as the reasoning employed.

The strong aversion held by courts to statutes which directly or by implication seem to contemplate self-incrimination has been to a degree lessened by immunity statutes passed in many States of the Union and by the Federal Congress, and such immunity statutes are liberally construed to advance the remedy. For example, the remote possibility that a prosecution might arise in a Federal jurisdiction which would not be within the letter of the immunity provision in a State statute or which might not be within the power of the State to grant, has been held not to render such statute inoperative. [Jack v. Kansas, 26 Sup. Ct. Rep. 73.] See, also, in this connection the reasoning of BURGESS, J., in City of St. Joseph v. Levin, 128 Mo. l. c. 593, a prosecution under the ordinances of St. Joseph for refusing to submit for the inspection of a police officer the book required to be kept by Levin as a pawn-broker, and which reasoning tends somewhat to a similar conclusion.

In this connection also the case of State v. Davis, 108
Mo. 666, may be considered instructive. In that case,
Davis, a druggist, was indicted for refusing to produce
before the grand jury of his county the liquor prescrip-
tions filed by him during the previous year, when law-
fully summoned to do so. A demurrer being lodged
against the indictment and sustained, the State appeal-
ed and the judgment, *nisi*, was reversed. The right of
the State to enforce publicity in cases where a party was
not entitled to do the things under investigation, ex-
cept by leave of the State itself (in that case, to sell li-
quor) was enforced. And, by parity of reasoning, it
may well be said that the right of the State to enforce
publicity under laws permitting foreign corporations
to do business in Missouri is strengthened by the reas-
oning of the lamented jurist who spoke for this court in
that case.

(3) There remains to consider the materiality of
the evidence sought in the books required to be produc-
ed. These books were the stock books of the Republic
Oil Company, and the power to compel the production
of books under the statute against pools and trust com-
binations is that found in our Code of Civil Procedure,
sections 737 *et seq.*, and the anti-trust statute itself.

It could not be successfully contended under these
sections that if the books required were not material to
the controversy the order to produce would be allowed
to stand. Assuming that the books in question are a
history of the registration and ownership of stock in
the Republic Oil Company, the question is, is such
ownership material? We think it is.

In the first place, our anti-trust statutes denounce
combinations of the sort here being considered as a
"conspiracy to defraud." [Secs. 8965 and 8966.] Now,
in investigating fraud, it is elementary that courts tol-
erate a wide latitude and a minute search; for fraud,
originating in oblique cunning, is often deeply laid
away and may be got at alone by the keenest scrutiny,

by acute probing and sometime by the aid of indirection, a weighing and shifting of motives, and, again, the putting together of trivial circumstances may furnish persuasive evidence of fraud. As said in Adriance v. Arnot, 31 Mo. 471, "When a question of fraud is before a jury, and the witness is competent, the apparent irrelevancy of the testimony is an unsafe ground for its exclusion." As was said in Hopkins v. Sievert, 58 Mo. 201, "Very slight circumstances, therefore, may, although apparently trivial and unimportant of themselves, afford, when combined together, irrefragable proof of fraudulent intent." As was said in Massey v. Young, 73 Mo. l. c. 273-4, "Fraud is rarely ever susceptible of positive proof, for the obvious reason that it does not cry aloud in the streets, nor proclaim its iniquitous purposes from the housetops. Its vermiculations are chiefly traceable by 'covered tracks and studious concealments.' . . . And though fraud is not to be presumed, yet it is as legitimate to infer its existence from surrounding circumstances pointing unmistakably to a wrongful purpose, as it is to thus infer under similar circumstances the commission of a crime; and this is done daily." Indeed, fraud is as illusive and subtle as the wind, of which it is said: The wind bloweth where it listeth and thou hearest the sound thereof, but canst not tell whence it cometh and whither it goeth, and its investigation of necessity needs scope and somewhat free rein.

It may be admitted that under some circumstances corporations with no community of interest as holders of stock in each other, or even where the stock was not in the hands of a holding company as trustee, might be guilty of a violation of our anti-trust law. It might further be admitted that a trust or combination might be proved by the overt acts of the agents of respondent corporations sufficiently distinctive and significant and of such long continuance as would tread back and tend to establish the obnoxious pact or trust agreement.

[State ex inf. v. Firemen's Fund Ins. Co., 152 Mo. l. c. 36, *et seq.*] Yet, experience has shown that stock holdings showing a community of interest, while in some cases innocuous, might in given cases be the very root from which the trust agreement grows. On principle, why may not this root be got at? In an investigation intended to lead up to the establishment of a fraudulent conspiracy between individuals, taking for illustration a fraudulent disposition of property, it could not be denied that kinship or close business intimacy would be relevant matter, for what it was worth, be that worth much or little, and we can perceive no good reason why this investigation may not commence at the very groundwork of these corporations, showing, if fact it be, a close relationship in stock holdings and in the personnel of officers and agents, the use of the same instrumentalities and methods, simultaneous in time and originating in the same radiating center—a sort of prenatal, natal or else post-natal disposition to combine, as it were—to be followed, of course, by sufficient proof indicating that the community of stock interest, if any, had been used as a foundation upon which to build the illegal structure denounced by the statute.

In cases where doubt exists proof of motive may fill an office in the administration of law. So that, without at this time intimating to our special commissioner the weight to be given to a community of interest in stock or the existence of stock ownership in the same individuals, or to the use of stock for a joint purpose, if any be shown, suffice it to say that we hold the ownership of stock a matter material to the pending investigation under the pleadings before us.

As to the contention that the stock book by express statute must be kept in New York, it must be apparent, first, that no such law is shown to exist, and, second, if it does exist, no reason is apparent why an exemplified and duly authenticated and compared copy of stock book entries might not be furnished.

Nor must anything we have said herein be construed to mean that in default of the production of the book itself, or pending its production, the best secondary evidence obtainable of stock ownership may not be introduced by the Attorney-General.

We have considered all questions we deem material on this branch of the case, at this time, and are persuaded the motions should be overruled. It is accordingly so ordered.

II. We come now to the consideration of another group of questions submitted to us. It seems that during a hearing before the special commissioner the Attorney-General filed a petition to compel the inspection of a certain written contract alleged to exist between the Waters-Pierce Oil Company, or between a partnership composed of Pierce and Waters (alleged to be the predecessor of the Waters-Pierce Oil Co.) and a certain corporation known as the Consolidated Tank Line Company, said contract alleged to be in the possession of the Waters-Pierce Oil Company.

It seems, furthermore, that the Attorney-General filed a petition before the special commissioner the object and general nature of which was to compel the production of certain books and papers showing regular reports of the amount of oil it sells in the State of Missouri, to certain parties at 26 Broadway in the city of New York, at which place is maintained the offices of the Standard Oil Company and the Republic Oil Company.

It seems, furthermore, that two other petitions were filed before said special commissioner by the Attorney-General, one of them alleging that orders received by the Waters-Pierce Oil Company from oil consumers in the Missouri territory, alleged to be allotted to the Standard Oil Company, are sent by said Waters-Pierce Oil Company to the Standard Oil Company to be filled; and *vice versa*, that orders received by the Standard Oil Company from oil consumers in the Waters-

Pierce Oil Company's territory are sent by the Standard Oil Company to the Waters-Pierce Oil Company to be filled; and that a record is made by the Waters-Pierce Oil Company and the Standard Oil Company of orders thus transmitted. An order is accordingly prayed requiring the Waters-Pierce Oil Company to produce any books, papers and documents in its possession showing the transmission of such orders from the Waters-Pierce Oil Company to the Standard Oil Company. The other petition was directed to the production of books, papers and documents alleged to exist relating to a certain contract or agreement made by the Waters-Pierce Oil Company with the Consolidated Tank line Company or the Standard Oil Company in the division of trade territory in the State of Missouri, the said Tank Line Company having been absorbed by the Standard Oil Company.

All said petitions were duly sworn to and upon them the commissioner ruled that the said books, papers and documents should be produced before him at a certain definite time and place, or cause should be shown why the same should not be produced.

Afterwards the issuance and service of this order were waived and thereafter the said Waters-Pierce Oil Company filed a return to the order to show cause. This return to the order to show cause is pending before the said commissioner, and in it respondent sets forth divers reasons why, it says, it should not be complied with. The sufficiency of this return is also submitted to us.

During the pendency of the foregoing matters the Attorney-General sued out a subpoena *duces tecum* which, issued by the commissioner and directed to C. M. Adams and R. B. Backus, was served upon Adams alone, who is the secretary of the Waters-Pierce Oil Company. This subpoena required the presence of Mr. Adams as a witness and that he produce certain designated and divers and sundry papers, books, documents, checks, vouchers, receipts, letters, copies of letters,

maps, etc., at a specified time and place. Adams appear-
ed as a witness, whereupon, respondent Waters-Pierce
Oil Company filed a motion to quash said subpoena, and
such subpoena and motion to quash are also certified
here by our commissioner at the request of counsel on
both sides for our action.

It furthermore seems that, without passing on the
motion to quash the subpoena, the special commissioner
required that Mr. Adams be sworn and compelled to
testify. During his examination, lengthy portions of
which are before us, many objections were made to
questions propounded to him, some being ruled against
respondents and others in their favor. By one of these
questions this witness was compelled to answer that he
was a stockholder in the Waters-Pierce Oil Company.
Strenuous objection was made to going into the owner-
ship of stock, but the commissioner ruled in favor of
the Attorney-General. This question was followed by
others directed to witness's knowledge of the other
stockholders in the Waters-Pierce Oil Company and
these questions were allowed by the commissioner over
objection by respondent.

At this stage of the examination, by the advice of
respondents' counsel and after the commissioner had
ruled that examination into the ownership of stock was
material (all of which is in accordance with our own
holding in the prior part of this opinion), the witness,
under the advice of counsel and on the theory that the
question was privileged, we suppose, declined to an-
swer a certain question. The transcript shows as fol-
lows:

"Q. Isn't it a fact, Mr. Adams, that at the present
time the Standard Oil Company owns or controls, eith-
er by itself or through a person for it, approximately
two-thirds of the stock of the Waters-Pierce Oil Com-
pany?

"Mr. Priest: Objected to for reasons last above
stated.

"Commissioner: I don't think the objection is well taken.

"To which action and ruling of the commissioner the respondents and each of them duly excepted at the time and still except.

"Mr. Johnson. We advise the witness not to answer on the ground stated." (As heretofore stated these grounds related to the question of privilege, as we understand the record).

"A. I decline to answer."

Following this a question was propounded to the witness as to whether he makes out the dividend checks of the Waters-Pierce Oil Company at the present time. This question was objected to and ruled proper by the commissioner, and exceptions were saved. Counsel advised the witness not to answer and the witness refused. Following that, the ensuing questions, objections, colloquies, and rulings developed:

"Q. Do you not know it to be a fact, Mr. Adams, that a dividend check is sent monthly, or as often as declared, to H. Clay Pierce, representing the dividend upon approximately three thousand nine hundred and ninety-six shares of the stock of the Waters-Pierce Oil Company, and that two-thirds of that amount is regularly turned over by Mr. Pierce to Mr. Tilford, or some other representative of the Standard Oil Company at 26 Broadway?

"Mr. Priest: I object to the question in the form it is in. It is complex and compound.

"Commissioner: The objection will be overruled.

"To which action of the commissioner in overruling said objection the respondents, and each of them, then and there duly excepted at the time, and still except.

"Q. Mr. Hadley: Answer the question, Mr. Adams.

"Mr. Priest: I object to it on the further ground that it is totally immaterial to this issue; that whatever information the witness had he had as an executive officer of the Waters-Pierce Oil Company, for whose acts he was responsible as an executive officer; whatever punishment might be inflicted upon it by reason of these proceedings would be chargeable to him personally, as well as to it; that the testimony is totally immaterial under the issues in this case; that there is no charge in the bill of any misconduct on the part of the stockholders of the Waters-Pierce Oil Company, and the amount of dividends received by them, or anyone of them, is totally immaterial; he is called upon to testify to facts which if material, as contended by the State in this case, would impose upon him as a stockholder of the Waters-Pierce Oil Company a forfeiture and inflict upon him personally a punishment or form a chain in the link of testimony tending in that direction.

"Which objection was by the commissioner overruled, and to the action of the commissioner in overruling said objection the respondents, and each of them, then and there duly excepted at the time, and still except.

"Mr. Johnson: We advise the witness, under the circumstances, not to answer the question.

"Q. Mr. Hadley: Do you decline to answer, Mr. Adams? A. I decline to answer.

"Q. For the reasons given by Judge Priest? A. Yes, sir.

"Q. You were subpoenaed to bring the stock book of the Waters-Pierce Oil Company here with you, were you not? A. I think that was mentioned.

"Q. Have you complied with that subpoena? A. I have not brought it; no, sir.

"Q. Are you willing to do so?

"Mr. Priest: I submit that he has no power to do so, and he has made his return in writing, and a motion

to quash has been made by the Waters-Pierce Oil Company in writing, and sworn to by him, and the witness adopted that statement in that motion to quash as sworn to by him, and he has been advised by counsel of the Waters-Pierce Oil Company that he cannot produce rightfully, and that he declines to produce in consequence of that advice, the books and papers specified in the subpoena.

"Commissioner: The proper course is for the witness to be interrogated as to his custody of the documents, and if he has not produced them, to give his reasons why.

"To which action and ruling of the commissioner the respondents, and each of them, then and there duly excepted at the time, and still except.

"Mr. Hadley: I assume that in my question.

"Mr. Priest: The paper which he has sworn to states the fact of his custody.

"Commissioner: I don't understand that that paper filed here, at least I doubt very much whether that would constitute an answer for the witness himself. He is now on the stand and sworn, and he must answer these preliminary questions, whether or not he brought the book, whether or not it is in his custody, and if he did not bring it, why he did not bring it.

"To which action and ruling of the commissioner the respondents, and each of them, then and there duly excepted at the time, and still except.

"Mr. Hadley: The stock book of the Waters-Pierce Oil Company is in your custody, isn't it, Mr. Adams? A. It is in a safe in our office.

"Q. You have charge of it as secretary of the company, have you not, and access to it? A. I have access to it and others have access to it; other officers of the company.

"Q. You are secretary of the company and as secretary have charge of the stock book of the company, do you not?

"Mr. Johnson: Isn't that a question of law, General?

"Commissioner: The only question is whether he has access to it and could get it and produce it here. I will permit the question.

"To which action and ruling of the commissioner the respondents, and each of them, then and there duly excepted at the time, and still except.

"Q. Mr. Hadley: Answer the question. Have you got the custody of that stock book of the Waters-Pierce Oil Company? A. I can't say that it is wholly in my custody.

"Q. Could you get it in your custody and bring it here in response to this subpoena if there were no legal objections raised by the Waters-Pierce Oil Company to your doing so? A. I would not consider that I had any right to take that book out of the safe and bring it here without authority.

"Q. From whom? A. From a superior officer.

"Q. Even if a court should order you to bring it here? A. I have no jurisdiction over that book. It is not in my custody to that extent that I could take it out of the office.

"Q. Well, it is in your care, is it not, and in your office as secretary? A. It is in the safe in the office.

"Q. And the laws of this State provide, do they not, to your knowledge, that the secretary of the corporation shall have charge of the stock book of the corporation? A. I don't know about the legal aspect of the matter.

"Mr. Priest: We object to the question.

"Commissioner: Objection sustained. . . . . .

"Q. Mr. Hadley: Have you brought that stock book here? A. I have not.

"Q. Are you willing to produce it here? A. Not unless counsel advise me to do so.

"Q. Why have you not brought it here?

"Mr. Priest: I submit that the witness has answered that question.

"Q. Commissioner: Mr. Adams, you may state whether or not that was the reason you did not bring that book? A. Under advice of counsel I was told that it would not be necessary to bring it here.

"Q. Mr. Hadley: Is that the only reason why you have not brought it? A. Yes, sir."

Thereupon the matter, to-wit, whether the witness should be compelled to answer each and every of said propounded interrogatories and produce said stock book, etc., was also certified to this court by the consent of counsel on both sides and the acquiescence of the commissioner.

In briefs here it is asserted by respondents and denied by informant that a question was certified relating to the materiality of evidence tending to show stock ownership. As we understand the record before us, no such question was certified by our commissioner. To the contrary, he had invariably ruled on the question of materiality against respondents, and, as said before, his rulings were to the same effect as our holding in the former part of this opinion. But it makes no difference whether the question of materiality was certified here or not, because in our opinion we should decline at this time to pass upon any of the petitions, orders, subpoenaes, motions, returns, objections and questions certified to us by the commissioner. Because, if in spite of our submission of this case to a special commisioner, we are to be required, as the ingenious versatility of counsel, on either side or jointly, may suggest from time to time, to issue orders to our commissioner to rule this way, that way or the other way, upon questions pending before him, or to withdraw, pro tanto and pro hac vice, our submission and take upon ourselves the burden of the case on interlocutory matters, the very object of the submission would be manifestly and largely defeated. This court has im-

pliedly complimented its commissioner, by virtue of his appointment to conduct this important investigation, as possessed of unsullied integrity and equipped with legal learning adequate to passing on testimony and ruling on matters presented to him and clothed him with power to enforce his rulings. The object of this reference was that, enlightened by the testimony preserved and assisted by the rulings and findings, the learning and research of our commissioner, we should be supplied with data necessary to determine once for all, on exceptions to his final report, the very right and justice of this cause. He is proceeding, so far as we can see, with circumspection and dignity to carry out the warrant of authority in our order of submission. We see nothing in any of his rulings requiring our interposition and certainly we will not assume that he will hereafter proceed in a manner contrary to due process of law or to the orderly administration of justice. We are aware of no analogies of the law in our practice sustaining the present submission to us. Certainly it is not the practice in this State for a referee to be required to report intermediate matters to the court appointing him for instruction from the court, nor is it the usual practice for a master in chancery, from time to time, to refer matters to the court appointing him so that he may be controlled in his rulings on evidence or other matters within the warrant of his authority. All these things are settled, by and large, upon his final report. If it then appears that he has erred in the admission of evidence, that evidence is excluded. If he has excluded proper evidence, the case may be sent back to him to hear and consider such evidence. If a witness decline to answer on the ground that his answer would incriminate him and is committed by the commissioner on the theory that the question is not privileged because the statute had granted immunity, or for other reasons, we see no reason why a witness should not take the same chance a defendant does when he stands on a demurrer

State ex rel. v. Bradley.

to a petition and finds when too late, maybe, on appeal that the petition was good and the judgment final and impregnable. At least, we are not willing to sanction any innovation by inaugurating the practice of applying here for instructions to a commissioner. He should be left free and uninfluenced by us to exercise in the first instance his judicial judgment. Nor does the importance of the case, or the fact that distinguished counsel are employed, or the gravity of the questions raised, demand that we should respond to anomalous requests. If we make such rule in this case, then, by the same token, it must be the rule of practice in every submission to a special commissioner on an original proceeding instituted here, and we will be compelled to consider certifications on interlocutory matters, however humble the case, however obscure the counsel employed, or however simple the matter involved.

The matters certified to us are, therefore, recertified to our special commissioner that he may proceed therewith and with all other matters pertinent to this hearing under the broad and flexible power given him by his order of appointment.

*Brace, C. J., Gantt, Valliant,* and *Marshall, JJ.,* concur; *Burgess* and *Fox, JJ.,* concur in the result.