STATE EX REL. ATTY. GEN. V. HOCKING VALLEY RY.

1. RAILWAY COMPANY UNLAWFULLY OWNS CONTROLLING INTEREST IN COAL MINING COMPANY.

A railway company. incorporated under the laws of Ohio has no authority to acquire and hold shares of the capital stock of a company incorporated to mine and deal in coal, and especially is this so when the shares of stock so held constitute a majority or controlling interest in such coal mining company.

2. RAILROAD COMPANY CONTROLLING COAL MINING COMPANY HELD MONOPOLISTIC.

The control and management of a coal mining company by a railway company, upon whose road the coal company is a shipper, through stock ownership tends to monopoly and restriction of trade and competition and is therefore unwarranted and illegal.

3. COAL MINE OUTLET RAILROAD 'NOT SUCH A COMPANY AS ANOTHER RAILROAD COMPANY MAY HOLD STOCK.

An incidental purpose in the charter of a coal mining company to construct a railway from its mines to a railway or other outlet does not constitute such coal mining company a railway or kindred company so as to make applicable Sec. 3300 or 3256 Rev. Stat., authorizing a. railway company to subscribe for and hold stock in another railway or kindred company.

4. ENDORSEMENT OF MINING COMPANY BONDS BY NATURALLY COMPETING RAILROADS ULTRA VIRES.

The endorsement and guarantee of the bonds of a coal mining company by a railway company is *ultra vires*, and so also is an agreement between railroad companies operating parallel and naturally competing railroads to endorse and guarantee the bonds of a coal mining company in consideration of an equal division between the railway companies of all freight to and from the mines of the coal company.

5. ONE RAILWAY OWNING MAJORITY OF STOCK IN NATURALLY COMPETING LINE: INVALID.

The ownership of a majority or controlling stock by one railway company of another railway company owning and operating a line of railway, a substantial part of which is in its general nature parallel to and naturally and actually forming a part of a parallel and competing system to that of the stockholding company, is illegal and unwarranted.

6 UNITY OF STOCK INTERESTS AND UNITY OF MANAGEMENT CIRCUMSTANCES TO SHOW CONTROL.

The control and management by one railway company of another operating parallel and competing lines or systems of railways through combination may be shown by the circumstances, and a unity of stockholding interests, together with unity of management, pursuant to an established plan to that effect, is sufficient proof.

7. OUSTER APPROPRIATE REMEDY WHERE ILLEGAL ACTS ARE PERSISTENT, DEFIANT AND FLAGRANT.

In cases where the right is doubtful and has not been adjudicated or finally settled and the illegal acts have not been persistent, defiant and. flagrant, the appropriate relief to be afforded in an action of quo war-

ranto against an offending corporation assuming to exercise unauthorized powers is to stop the abuse by ousting the corporation from the right to do the illegal acts or continue the unauthorized business.

[Syllabus by the court.]

QUO WARRANTO.

**W. H. Ellis**, Atty. Gen., **S. W. Bennett** and **E. C. Morton**, for plaintiff.

**J. H. Hoyt, Doyle, Lewis & Shauffelberger** and **C. O. Hunter,** for defendant.

## ALLREAD, J.

This action was brought to oust the defendant, the Hocking Valley Railway Company, from the exercise of its charter powers.

The charter among other things authorizes the defendant to "acquire the real and personal property, roadbeds, right of way, fixtures and franchises formerly of the Columbus, Hocking Valley and Toledo Railway Company * * * and generally to possess, exercise and enjoy all the rights, liberties, faculties and franchises formerly of the said The Columbus, Hocking Valley and Toledo Railway Company and all the consolidated railroad corporations under the laws of Ohio."

There are nine offenses charged, relating to the defendant's ownership of stock in, control over and agreement with, certain coal mining and certain other railway corporations and of discriminations in transportation facilities.

The admissions of the pleadings and the evidence offered shows that defendant was incorporated February 25, 1899, under the laws of this state as a railway company, and about the date of incorporation acquired by purchase at judicial sale under foreclosure proceedings in the United States circuit court at Cincinnati, Ohio, the railroad and other properties of the Columbus, Hocking Valley & Toledo Ry. Co.

The purchase was made and properties acquired through a reorganization committee, and under a plan issued January 4, 1899, by J. P. Morgan & Co., who were the reorganization managers and afterwards the fiscal and financial agents of the defendant company.

The plan of reorganization was afterwards referred to, ratified and adopted by the stockholders' meeting.

The statement of property of the old company in the issued plan of reorganization contains among others the following:

All the stock (15,000 shares, face value $1,500,000) of the Hocking Coal & Ry. Co., holding 10,000 acres of coal land in the Hocking Valley district.

State v. Railway.

All the stock (2,000 shares, face value $200,000) of the Ohio Land & Ry. Co. controlling about 10,975 acres in the same district.

The Buckeye Coal & Ry. Co. was incorporated under Ohio laws February 15, 1899, and succeeded by purchase to the properties of the Hocking Coal & Ry. Co., and the stock passed into the hands of the reorganization committee as a substitute for the stock of the latter company, and thereafter all the stock, except five shares to qualify directors, passed to the defendant company. The Buckeye Company acquired control, either by lease or through stock ownership, of the lands and properties of the Ohio Land & Ry. Co.

The charter of the Buckeye Company, in addition to coal mining and kindred purposes, contains authority to construct a railway from any mine, quarry or manufactory to any other railway, water navigation, or place within or upon the borders of Ohio.

The Sunday Creek Coal Company was incorporated under Ohio laws in 1899 with a similar charter to the Buckeye Coal & Ry. Co., and acquired and controlled about 12,000 to 13,000 acres of coal lands in the Hocking district.

During the progress of the reorganization, or at least before finally concluded, J. P. Morgan & Co. at the request of Mr. Monserrat, president of defendant company, purchased a majority of the capital stock of the Sunday Creek Coal Co., viz., 7,643 preferred and 11,796 common, out of a total of 15,000 preferred and 22,500 common, paying therefor $342,860. This transaction was ratified by the board of directors of the defendant company May 4, 1899, and the stock with other properties acquired by the reorganization committee passed to the defendant. After the completion of the reorganization the defendant increased its holdings in the Sunday Creek Coal Co. up to December 5, 1905, by the purchase of 5,296 preferred and 7,524 common, making a total of 13,939 preferred and 19,370 common.

The Continental Coal Co. was incorporated under West Virginia charter January 24, 1902, and admitted to do business in Ohio February 1, 1902. On November 7, 1902, the defendant and the Toledo & O. C. Ry. Co. entered into an agreement with the Continental Co. to receive and endorse and guarantee the bonds of the coal company in the amount of $2,750,000. This agreement was based upon the consideration on the one hand of the railway company's obtaining the large traffic furnished by the coal company, and on the other hand to furnish the coal company with "needed working capital to enable it to improve and develop its mines and to increase the capacity thereof and to ac-

quire additional equipment and other property." The contract also provides for an equal division of the entire traffic of coal and other freight coming from and to the properties of the coal company, and for a surrender of all the stock of the company (34,995 shares) except five shares to maintain its existence, to J. P. Morgan & Co., trustees, who retain the legal title and record ownership with full voting power, giving certificates of beneficial ownership to actual stockholders. The stockholding and voting trust to continue until the $2,750,000 guaranteed bonds are lifted. On October 7, 1902, the stockholders of the defendant company affirmed the tripartite contract between the two railroad companies and the coal companies, and also the authority of J. P. Morgan & Co. as syndicate managers.

The Continental Coal Co. acquired 800 acres by purchase and 27,-600 acres by lease with twenty-two mines in operation and valued at $653,787.62.

The Sunday Creek Co. was incorporated in New Jersey, June 29, 1905. The New Jersey charter is very broad, but the authority in Ohio was limited to coal and other mining, manufacturing coke and dealing in coal and coke, and generally to transact all the business conferred on, or permitted to be done by, the laws of Ohio by a coal and railway company, and a mining and manufacturing company organized under the laws of Ohio. The Sunday Creek Co. took by purchase the properties of the Sunday Creek Coal Co. and by lease those of the Buckeye Coal & Ry. Co., the Continental Coal Co. and the Kanawha & Hocking Coal & Coke Co., the latter being a West Virginia mining company owning 21,300 acres of coal lands in West Virginia valued at $1,050,000, and operating under lease on royalty basis also in West Virginia 10,900 acres valued at $390,119.91, and coke ovens (381) valued at $207,803.87, making a total, Ohio and West Virginia, of 100,501 acres of coal lands with forty-four mines in operation and coke ovens valued at $4,464,885. It also became the owner of the beneficial certificates of stock of the Continental Coal Co.

The Kanawha & Michigan Ry. Co. is a railway company owning and operating a railway extending from Corning, Perry county, Ohio, southwardly to Hobson near Middleport, thence southwest by trackage arrangement over the Hocking Valley branch to a point opposite Point Pleasant, thence leaving the Hocking Valley tracks crossing the Ohio river into West Virginia to Gauley Bridge, a distance of 100 miles in West Virginia and sixty-eight miles in Ohio.

Prior to June 4, 1903, a majority of stock of the Kanawha & Michi-

State v. Railway.

gan Ry. Co. was held by the Toledo & Ohio Cent. Ry. Co. and was operated by the same officers and in connection with the latter company, and as a connecting and continuous line.

On the date mentioned the defendant company acquired from the Toledo & Ohio Cent. Co. the majority stock of the Kanawha & Michigan Co. in exchange for all the stock and bonds of the Zanesville & Western Ry. Co.

From and after this transfer a majority of the directors of the Kanawha & Michigan Co. have been taken from the directorate of the defendant, and the president and managerial offices of the defendant have been assigned to similar positions in the Kanawha & Michigan Co.

The Toledo & Ohio Cent. Ry. Co. is a railway company owning and operating a railway from Corning, Perry county, Ohio, north and north-westerly in two divisions to Toledo, Ohio, and the Great Lakes, and has been and is now operated in connection with the Kanawha & Michigan as the southern extension to the Ohio river and into West Virginia.

At the time of the organization of the defendant company it was stipulated in the regulations adopted by the stockholders that 50,000 shares preferred and 50,000 shares common stock of the defendant company (face value $10,000,000) should be reserved to be issued upon approval of J. P. Morgan & Co., reorganization managers, under the plan of reorganization dated January 4, 1899, for the purpose of acquiring interests in the Toledo & Ohio Cent. Ry. Co. and the C. S. & H. Ry. Co. or successors.

In February, 1902, the defendant company purchased the stock and bonds of the Zanesville & Western Ry. Co., successor of the C. S. & H. Ry. Co., giving in exchange out of the reserved stock $1,000,000 preferred and $578,400 common.

It does not appear by any direct evidence that the stock of the Toledo & Ohio Cent. Co. has been received in exchange for reserved stock of the defendant, nor that the balance of reserved stock amounting to $4,000,000 preferred and $4,421,600 comon has been issued. But it is admitted that a syndicate of individuals or corporations hold a substantial majority of the common stock of the defendant company, and that the same parties or their connections or allied interests hold a controlling interest in the capital stock of the Toledo & Ohio Central. The common stock of the defendant is $15,000,000, the preferred stock is the same, with equal voting power. Nothing appears as to the ownership of defendant's preferred stock. The president, majority of board

of directors and managerial officers of the Toledo & Ohio Central are the same as the defendant's.

The Zanesville & Western Ry. Co. is an Ohio railway corporation which acquired the railroads and properties of the Columbus, Sandusky & Hocking south and east of Columbus extending from Thurston, a connection on the Toledo & Ohio Central, south and east to Zanesville and the Hocking coal fields extending into these fields by several branches. All of its stock and bonds were purchased by the defendant out of its reserved stock and afterwards transferred to the Toledo & Ohio Cent. Ry. Co.

The plan of reorganization of the Hocking Valley Ry. Co. issued January 4, 1899, and ratified at the stockholders' meeting of the Hocking Valley Ry. Co., February 25, 1899, recites that the transportation of bituminous coal from mines or adjacent property is the principal business of the Hocking Valley Co., and that that business was strictly and intensely competitive among the five companies, viz., The Hocking Valley, Toledo & Ohio Cent., C. S. & H., the Baltimore & Ohio, and Baltimore & Ohio S. W., but particularly among the first named three, and declares that the plan of reorganization should be flexible enough to admit of their acquisition.

A reserve of $10,000,000 of preferred and common stock of the defendant was set apart by the stockholders to acquire these properties, and the Zanesville & Western was so acquired and exchanged for the majority stock of the Kanawha & Michigan. The controlling stock of the Toledo & Ohio Central was acquired by the syndicate and allied interests holding the common stock of the Hocking Valley Company, and the Hocking Valley officials took charge of the Toledo & Ohio Central, the Zanesville & Western and the Kanawha & Michigan. These railways traversing by main line and by branches and extensions the Hocking coal fields, formerly intensely competitive, were now placed under one, or at least the same management.

The old Hocking Valley Ry. Co. at the time of its reorganization held the stock of the Hocking Coal & Ry. Co. and the Ohio Land & Ry. Co. The former was taken over by the Buckeye Coal & Ry. Co., which acquired, by lease or ownership stock, operating control of the Ohio Land & Ry. Co., making 20,975 shares of coal lands in the Hocking district.

Before the reorganization was consummated the holdings of the Hocking Valley Co. in coal companies were increased by purchase of a majority of stock in the Sunday Creek Coal Co., holding 12,000 to 13,-

State v. Railway.

000 acres, and then again by the agreement for the endorsement of the bonds and the surrender of the voting power of the stock of the Continental Coal Co. 28,400 acres more passed into Hocking control, so that at the time of the bringing of the suit over 60,000 acres of coal lands, valued at $2,800,000, were held by coal companies whose controlling stock was held by the Hocking Valley Ry. Co.

Since the suit has been pending the Sunday Creek Co. of N. J. has entered the field and taken over all the properties of the former companies under the Hocking Valley Co.'s control and acquired the large and valuable properties of the Kanawha & Michigan Coal Co. in West Virginia, increasing the acreage to more than 100,000 in Ohio and West Virginia, valued at about $4,500,000.

The Sunday Creek Co., a merger, acquired by purchase the properties of the Sunday Creek Coal Co., 12,000 to 13,000 acres. The balance is held by it by lease or operating contract.

This merger, the Sunday Creek Company, mines and furnishes for transportation 84 per cent of the output on the line of the Toledo & Ohio Cent. Ry., 58 per cent on the Kanawha & Michigan, 55 per cent on the Zanesville & Western, 39.9 per cent on the Hocking Valley, and 34.7 in the Deavertown district, and distributes this large output not only to the nearby cities but through connecting railroads and the Great Lakes reaching the markets of our own state as well as Indiana, Illinois, Michigan and the Northwest.

In respect to ownership of stock in other corporations, it is a familiar principle in this state that the powers of a corporation under its charter and the incorporation acts are to be strictly construed, and upon no subject has this doctrine been more frequently and rigidly applied than with reference to acquisition and holding of stock in its own and other corporations. *Valley Ry.* v. *Iron Co.* 46 Ohio St. 44 [18 N. E. Rep. 486; 1 L. R. A. 412]; *Straus* v. *Insurance Co.* 5 Ohio St. 59; *Toledo, C. & St. L. Ry.* v. *Hinsdale,* 45 Ohio St. 556 [15 N. E. Rep. 665]; *Coppin* v. *Greenlees,* 38 Ohio St. 275 [43 Am. Rep. 425]; *Col. H. V. & T. Ry.* v. *Burke,* 10 Dec. Re. 136 (19 Bull. 27); *Franklin Bank of Cincinnati* v. *Bank,* 36 Ohio St. 350 [38 Am. Rep. 594].

In *Franklin Bank of Cincinnati* v. *Bank, supra,* Boyton, J., says, page 354:

"There would seem to be little doubt, either upon principle or authority, and independently of express statutory prohibition of the same, that one corporation cannot become the owner of any portion of the capital stock of another corporation, unless authority to become such is

clearly conferred by statute. * * * Were this not so, one corporation, by buying up the majority of the shares of the stock of another, could take the entire management of its business, however foreign such business might be to that which the corporation so purchasing said shares was created to carry on. A banking corporation could become the operator of a railroad, or carry on the business of manufacturing, and any other corporation could engage in banking by obtaining the control of the bank's stock. * * *

"This would not only be exercising powers granted to the plaintiff neither expressly nor by implication, but those which are clearly opposed to the manifest spirit and intent, if not to the language of the statute."

Railway companies are classified by statute, and Sec. 3300 Rev. Stat., deals with the subject of stockholding by railway companies in other corporations and permits them to become stockholders in other railway companies to aid in the construction of a connecting and non-competing line. This authority is consistent with, and in furtherance of, the objects of the charter. Sec. 3546 authorizes a railroad company to take and own stock in a bridge company, and Sec. 3448 in a Union depot company. Both are consistent with the charter. The railroad company may, and generally does, build the bridges and depots; but in special cases it may aid by taking stock in an independent company.

Section 3842 Rev. Stat. confers power upon a railroad company to subscribe stock in an elevator company, but limits the amount subscribed to a minority of one-third of the capital stock. This indicates a legislative intent of giving a railroad company, in the single case of holding stock in a company with which it deals, power to aid but not control.

These are the only statutes conferring upon railroad companies power to hold stock in other corporations.

Unless, therefore, express authority is found under general statutes fairly extending to and including railway companies giving the additional power to hold stock of other companies, the principle laid down by Boyton, J., that the power of holding stocks unless expressly conferred does not exist, must be applied.

The corporation act in its general scope confines corporations to a single main purpose and such collateral purposes as may be incidental to the main purpose. This is intended by the legislature to prevent the chartering of monopolies and to classify and regulate corporations according to the stated purpose. *State* v. *Taylor*, 55 Ohio St. 61 [44 N. E. Rep. 513].

State v. Railway.

Counsel for defendant contend—citing cases supporting the contention—that the court will not go behind the corporation entity of the subsidiary company or identify the responsible stock ownership. Those, however, are cases of contract or of civil rights depending upon the corporation in its artificial capacity. It has never been held that the state may not call the corporation to account, not only for acts done openly and directly, but also for acts done indirectly or by a subterfuge.

Williams, J., in *Gas & Fuel Co.* v. *Dairy Co.* 60 Ohio St. 96, 106 [73 N. E. Rep. 711; 64 L. R. A. 395], lays down the rule:

"When the action of a corporation is challenged by the sovereignty which gave it existence, or by whose favor it is permitted to pursue its business, it may be required to show a clear warrant for the acts so called in question; while in suits between individuals and corporations, or between corporate bodies, where private rights are involved, the rule is not inflexible, and yields to considerations of right and justice."

In the case of *State* v. *Oil Co.* 49 Ohio St. 137, 139 [30 N. E. Rep. 279; 15 L. R. A. 145; 34 Am. St. Rep. 541], it was held that the fiction of incorporation may be ignored by the state in calling into question powers exercised by or through a corporation; and that the state is not bound by the mere form in which a transaction is clothed.

In the case of the *Northern Securities Co.* v. *United States,* 193 U. S. 197 [24 Sup. Ct. Rep. 436; 48 L. Ed. 679], it was contended that the securities company had a lawful right to hold the controlling stock of competing railway companies as an investment and should not be held accountable for a resulting course of conduct by the railway companies as to competition; but the court looked to the substance of the transaction rather than the form, holding the combination of competing companies through the medium of a holding company to be unlawful.

The following cases also support the view that a holding company cannot escape the responsibility following from ownership of a majority of stock: *Burrows* v. *Metropolitan Co.* 156 Fed. Rep. 389; *Distilling & Cattle Feed Co.* v. *People,* 156 Ill. 448 [41 N. E. Rep. 188; 47 Am. St. Rep. 200]; *State* v. *Oil Co,* 194 Mo. 124 [91 S. W. Rep. 1062]; *People* v. *Gas Trust Co.* 130 Ill. 268 [22 N. E. Rep. 798; 8 L. R. A. 497; 17 Am. St. Rep. 319]; *Dunbar* v. *Telephone Co.* 224 Ill. 9 [79 N. E. Rep. 423; 115 Am. St. Rep. 132]; *Bigelow* v. *Mining Co.* 155 Fed. Rep. 869; *Farmer's Loan & Tr. Co.* v. *Railway,* 150 N. Y. 410 [44 N. E. Rep. 1043; 34 L. R. A. 76; 55 Am. St. Rep. 689]; *Pearsall* v. *Railway,* 161 U. S. 646 [16 Sup. Ct. Rep. 705; 40 L. Ed. 838].

Franklin County.

It is urged that express power to hold the coal company stocks is found in Sec. 3256 Rev. Stat., which among other things provides:

"And a private corporation may purchase, or otherwise acquire, and hold shares of stock in other kindred but not competing corporations, whether domestic or foreign, but this shall not authorize the formation of any trust or combination for the purpose of restricting trade or competition."

Assuming that this statute applies to railway companies it must appear, to justify the acquisition and holding of the stock, that the corporations are kindred and noncompeting, and that no combination restrictive of trade or competition is formed.

A discussion of kindred purposes as applied to corporations by Spear, J., is found in *State* v. *Taylor, supra,* where it was held that a corporation formed to manufacture gas and electricity and furnish light, heat and power to a municipality and its citizens, cannot amend its charter to authorize the construction and operation of an electric railway.

Under the definition given and applied here a railway company and a coal mining company cannot be deemed kindred. They are not in the same statutory classification, and are governed by different laws. The purposes are essentially different. The railway company could not be authorized to transact directly a coal mining business. In this fact is found a plausible reason for the organization of subsidiary companies. By this means a formal appearance of regularity is given to enable a railroad company to control and carry on the distinct and separate business of coal mining.

Again it is urged that the Buckeye and Sunday Creek Coal Companies have charter power to construct railroads, and that therefore both Sec. 3300 and the kindred corporation clause Sec. 3256 are applicable.

But it will be observed that the railroad purpose in the coal company's charter is incidental to the main purpose and is limited to such "as may be deemed necessary to carry out the objects of its incorporation" and the railroad to extend from "any mine, quarry, or manufactory owned or operated by said company to any other railroad, or to any canal or water navigation or navigable water or place within or upon the borders of the state of Ohio." The railroad contemplated by this authority is to begin at a mine, etc., and end at a railroad or other outlet. It is a private road for the benefit of the coal company, and it is in no sense a public road. *Miami Coal Co.* v. *Wigton,* 19 Ohio St.

State v. Railway.

560; *Col. H. V. & T. Ry.* v. *Burke, supra; Snow Fork & Clev. Coal Co.* v. *Hocking Coal & Ry. Co.* 6 Dec. 178 (4 N. P. 115).

Besides there is no evidence to show that the coal companies ever exercised this charter power by attempting to build or acquire a railroad. No stock can be issued under Sec. 3300 except to aid in the construction of a connecting and noncompeting railway. This section does not authorize the railway company to extend aid to the coal mining purposes of the charter. Nor can this railroad clause in the charter furnish the connecting link of kinship under Sec. 3256, because, in the first place, of the nonexercise of the railroad clause, and in the second place, because the main purpose of a corporation fixes its class. *Taggart* v. *Iron & Steel Co.* 16 O. F. D. 000 [141 Fed. Rep. 910; 73 C. C. A. 174].

A railroad company cannot be classed as a hotel company because it operates one or more eating houses as incidental to its passenger traffic, nor as a land company because it has acquired more land than is necessary for railroad uses.

The fact that the railroad chapter applies to the railroad if constructed by the coal company does not change the classification. The act only gives to coal companies the power as incidental to its business of constructing a private railroad, and places the railroad when constructed under the regulations provided for in the railroad charter. *Taggart* v. *Iron & Steel Co., supra.*

It is contended that the power to acquire the coal mining stocks is found in the clause in the charter authorizing the company to acquire all the "real and personal property" of the old company. But power to be sustained must not only be within the charter but within the terms of the corporation act. While the case of *Gas & Fuel Co.* v. *Dairy Co. supra,* extends somewhat the strictness of the rule of acquisition of property not indispensable to the purpose for which the corporation was chartered, yet neither this case nor the later case of *State* v. *Railway;* 68 Ohio St. 40 [67 N. E. Rep. 93; 64 L. R. A. 405; 96 Am. St. Rep. 635], justify the acquisition of unauthorized stock, or the carrying out of a purpose not within the spirit and intent of the corporation act. Nor is the decision of Lurton, J., in the case of *Central Trust Co.* v. *Railway,* 10 O. F. D. 328 [87 Fed. Rep. 815], conclusive either as a precedent or as an adjudication upon the state seeking an account of acts done under the charter. The learned judge in that case, between private suitors where considerations of right and justice between the parties are controlling, places special emphasis upon the giving of the mortgage sought to be annulled not alone by the corporation, but re-

inforced by action of all the stockholders, and that the bonds secured by the mortgage had passed into innocent hands, while the mortgagees seeking the relief took expressly subject to the mortgage sought to be annulled. The case did not, however, involve the power of the railway company to hold the coal mining stock, but only involved the power of the coal company by express consent of all its stockholders to mortgage its property to a railway company. It will be noted, however, in the case at bar that the stock now held by the defendant in the coal companies did not come directly from the foreclosure sale. The Buckeye Company was incorporated and became the owner of the Hocking Coal & Ry. Co. property by purchase, and its stock passed by voluntary acquisition to the reorganization committee, and thence to the present company. While the acquisition of the Sunday Creek Coal Co. stock was wholly distinct from the foreclosure sale, although the properties were grouped together by the reorganization committee.

The claim is made that because coal companies are authorized by statute to acquire stock in transportation companies, a public policy is thereby evidenced which could be extended to railway companies owning stock in coal companies. This claim is not supported by the doctrine of strict construction, and a material difference may be found between coal companies acquiring an interest in railroads, and railroad companies acquiring an interest in coal companies. The railway company has advantages of discrimination and trade restrictions which coal companies do not have.

Counsel for the railway company cite from Wood on Railways, Sec. 194, to the effect that a railway company may own a coal mine as incidental to its railroad purposes, and may sell the surplus coal. A clear distinction, however, may be drawn between the case of a railroad company owning a coal mine for its own use and engaging in the coal mining business for the general market. This principle is illustrated in the case of the *Marietta & C. Ry.* v. *Telegraph Co.* 38 Ohio St. 24, in which it was laid down by McIlvaine, J., that while a railway company may build and operate a telegraph line for its own use, it cannot engage in the general telegraph business.

But, after all. the controlling question to be decided here is whether through this stock ownership in subsidiary coal companies a combination has been formed restricting trade and competition. For even if the abstract right of holding stock be conceded, yet such right cannot be extended to cases resulting in or having the legitimate tendency of restrictions of trade or competition. *Northern Securities Co.* v. *United*

### State v. Railway.

States, supra; Bigelow v. Mining Co. supra; Distilling & Cattle Feed. Co. v. People, supra; Burrows v. Metropolitan Co. supra; Louisville & N. Ry. v. Kentucky, 161 U. S. 677 [16 Sup. Ct. Rep. 714; 40 L. Ed. 849]; Dunbar v. Telephone Co. supra.

In considering combinations by stock ownership between railway and shipping corporations, we should not overlook the important influence of the carrier both as to rates and facilities upon the business of the shipper.

Rebates and discriminations in shipping facilities are well known and recognized as most effective aids in building up monopolies and breaking down competition. The former has been made the subject of penal laws by congress and in many of the states. The latter is none the less effective in restricting trade and embarrassing competition.

At common law public or common carriers were required to serve all without discrimination, and railway companies by their incorporation are vested with a portion of the sovereignty of the state to carry out the public duties of a common carrier. They become quasi-public agents to administer a public duty without discrimination to all citizens. Scofield v. Railway, 43 Ohio St. 571 [3 N. E. Rep. 907; 54 Am. Rep. 846].

This obligation as stated by Baxter, J., in Dinsmore v. Railway, 2 Fed. Rep. 465, is: "To do exact and even-handed justice to everybody offering to do business with them."

For a railroad company to acquire an interest in the subject-matter is inconsistent with the trust.

It is a sound principle everywhere acknowledged, that no man—even if his motives be as correct as those attributed to Sir Matthew Hale—can be a judge in his own case, or a case in which he has a private interest; and this principle applies to all cases of public trust.

How then can a railway company be sustained in exercising a public function conferred by its charter of equal service to all shippers when it has acquired a private interest in the business of one?

To illustrate: The Buckeye Company desires a rate, a distribution of cars, or an extension of track facilities, and applies to the railway company which practically owns its stock. The subject is taken up by the president and board of directors of the railway company, who are also president and directors of the coal company. At the same time a similar request is made by an independent company in competition with the Buckeye company. The railway company is interested in the Buckeye company, and yet under the law it is required to deal with absolute

Franklin County.

impartiality between the company in which it has an interest and its rival. The railway company may be able to do this; yet the law looks upon the tendency, and has regard to the frailties of human nature and the temptation of being controlled by self interest.

> "If self the wavering balance shake
> It's rarely right adjusted."

In *Piatt* v. *Longworth*, 27 Ohio St. 159, where an administrator had acquired an interest in the sale made by him as trustee, Johnson, J., said:

"In such cases the court will not suffer itself to be drawn aside from the application of this equitable rule by any attempt on the part of the purchasers to establish the fairness of the purchase, because of the danger of imposition and the presumption of fraud, inaccessible to the eye of the court.

"The policy of the rule is to shut the door against temptation in cases where the relationship exists."

In line with this rule it has been held that it is not necessary to produce proof showing actual restriction of trade or stifling of competition, but it is sufficient to show a legitimate tendency to that effect. *Central Ohio Salt Co.* v. *Guthrie*, 35 Ohio St. 666, 672; *State* v. *Oil Co. supra.*

So here it is not essential to show that discriminations or increase of rates actually resulted. But it is clear that the direct tendency of a combination by stock ownership in coal shipping companies by the railway company is toward discrimination and trade restrictions, and this proposition is recognized in the discussion of Mr. Justice White in the case of *New York, N. H. & H. Ry.* v. *Interstate Com. Com.* 200 U. S. 361 [26 Sup. Ct. Rep. 272; 50 L. Ed. 515], in which it is stated that the effect of the Chesapeake & Ohio Ry. Co., becoming a dealer in coal along its line was to exclude every other dealer, and that this result was not accidental but followed legitimately. Mr. Justice White in this opinion cited with approval the case of the *Attorney General* v. *Railway*, 29 L. J. Ch. N. S. 794, wherein it was decided that a railway company had no power to become a dealer in coal for the public market.

In the English case cited it appeared that a railway company from the coal fields in the north of England had established a coal agent in London and had engaged indirectly in the buying and selling of coal for the general market, and in the course of eight years it had monopolized practically the entire coal business in that section. It was urged in argument that other railroads entered the London market from the

State v. Railway.

Lancashire district and from the Bristol and other districts in the south-west, but the Vice Chancellor replied that nothing would prevent the other roads, if the business was legal, from acquiring a monopoly in those districts and giving the monopoly of the entire business of deal-ing in coal to the three railroads; and adding, ''If they can do that with respect to coal, what is to prevent their doing it with every species of agricultural produce all along the line? Why should they not become purchasers of corn, of all kinds of beasts, and of sheep, and of every species of agricultural produce, and become great dealers in the supply of eatables in the markets of London, and why not every other species of commodity that is purchased in every part of the country from which or to which the railroad runs? I do not know where it is to stop, if the argument on the part of the company is to prevail. There is therefore great detriment to the interests of the public, for this reason, taking merely the article of coal.''

The results feared by the English Vice Chancellor are modest com-pared with the possibilities in this country. If a railway company can buy and sell, and thereby become the exclusive dealer in coal along its line, the grain carrying railways may monopolize the grain business; other railways the carrying of live stock, others the carrying of manu-factured goods, while others the products of the iron and other mines; and if then it is possible, that all railway interests of the United States may be combined under one management, the enormity and extent and importance of the proposition of controlling by subsidiary companies or otherwise the output of the mines and the farm and the factory becomes apparent, or at least capable of being imagined.

The ownership of the defendant of the stock in the subsidiary coal companies and the control resulting therefrom is illegal and unwar-ranted.

The contract of the defendant with the Continental Coal Co. for an equal division of coal shipments between the Hocking Valley and T. & O. C. Railways tends to stifle competition and is also unwarranted. The guaranty of the bonds of the coal companies, while a valid obliga-tion as affecting the property of the railway and coal companies in favor of the mortgagees, yet as against the state is illegal and unwar-ranted.

In respect to the ownership of stock in the Kanawha & Michigan Ry. Co., it is admitted that the defendant owns the majority of such stock, but claims that the line is not parallel nor competing. For more than one-third of its line the Kanawha & Michigan is parallel to the

### Franklin County.

defendant's line and is more or less competing, but its competing features are pronounced and made clearly apparent when it is viewed as a natural as well as actual connecting road of the Toledo & Ohio Central system. The cases cited by the defendant's counsel where there is an inconsequential part of the lines parallel and competing, but where in the general features of the two roads they are noncompeting, and not parallel, do not apply here, for a substantial part of the Kanawha & Michigan line is parallel and competing in the coal mining business, which forms a substantial part of the carrying business of the railroad companies involved.

In respect to the Toledo & Ohio Cent. Ry. Co., it is conceded to be a parallel line with the defendant, but the defendant denies that it owns or holds the stock of the Toledo & Ohio Cent. Co. It is agreed however, that the stock of the Toledo & Ohio Cent. Co. is held by the same stockholders or their allied interests, to wit, the J. P. Morgan & Co. syndicate, and is officered by the same persons as the defendant. Unity of stockholding interests and unity of management is strong, if not conclusive, evidence of combination. This combination of parallel lines is restrictive of competition, and is contrary to the letter as well as the spirit of the corporation laws. It is difficult to conceive of competition where one person and one agency controls both corporations. Can a shipper appeal with any hope of success for competition to two companies controlled by the same management? A shipper appeals to Mr. Monserrat, as president of the defendant, for rates or facilities, and is not able to obtain a satisfactory concession. He then desires to make application to the parallel line of the Toledo & Ohio Central and is compelled to go before the same president and the same board of directors. A mere statement of the question is its own answer.

The state is not bound to show in cases of combination a record of the agreement resulting in the destruction of competition. It is not to be anticipated that in every case where a combination actually exists it is reduced to formal written agreement, or that all stockholding combinations appear of record upon the stock books. A verbal or even secret combination is just as obnoxious to public interests. We may therefore look to the evidence as in other cases of conspiracy. Unity of stockholding interests and of management, supplemented by the general plan of reorganization of the defendant company, is sufficient to show a combination. *State* v. *Oil Co. supra.*

The combination of the defendant, therefore, with the Toledo & Ohio Cent. Ry. Co., as shown by the evidence referred to, as well as its

State v. Railway.

ownership of a majority of stock of the Kanawha & Michigan Company, is illegal and unwarranted.

In respect to the Zanesville & Western Ry. Co., by a stock owner-- ship it has become a part of the Toledo & Ohio Central System, and so far as this action is concerned, may be considered as a part of that sys- tem. The defendant does not hold or control this company except through its agreement or combination with the Toledo & Ohio Central, that of itself will carry a dissolution of all combination with the Zanes- ville & Western.

In respect to the relief to be awarded, it may be said that the rule is found in the case of the *State* v. *Dairy Co.* 62 Ohio St. 350 [57 N. E. Rep. 62; 57 L. R. A. 181]. By this authority it is held that where the manner of conducting a business by a corporation is in excess of its charter and in violation of law, the court has power to stop the abuse; and if the illegal acts have been persistent, defiant and flagrant, the court may oust the defendant from its charter and terminate its cor- porate existence. The drastic remedy of terminating the corporation's existence is only to be applied where the acts are persistent, defiant and flagrant. In other cases the power of the court is limited to stopping the abuse, or, in other words, ousting the company from the right to do the illegal business.

In the case of the *State* v. *Oil Co., supra,* the court merely ousted the company from authority to do the illegal business. The acts done by the Standard Oil Co. in the case referred to were quite as continuous and quite as obnoxious to the public interests as those involved here. The right of the defendant to own and control the stock of the sub- sidiary companies has been an open question, as is also the right of the defendant to own a majority of the stock of the Kanawha & Michigan Company. The course of the defendant, therefore, in asserting its claim to the ownership of these stocks can hardly be said to be flagrant and persistent until the question has been authoritatively adjudicated.

A more serious question is presented by the indirect control and management of the Toledo & Ohio Cent. Ry. Co., and the formation of the Sunday Creek Co. since suit began. But upon a consideration of the whole case the court has arrived at the conclusion that the facts do not warrant a judgment of ouster from the charter or corporate exist- ence of the defendant; but do require that the defendant be ousted from its ownership of stock in the Buckeye Coal & Ry. Co., the Sunday Creek Coal Co., the Sunday Creek Co. and the Continental Coal Co.; that it be ousted from its right to continue the guaranty of the bonds

of these companies; that it be ousted from its right to hold stocks in the Kanawha & Michigan Ry. Co., and from its control and management of the Toledo & Ohio Cent. Ry. Co., the Zanesville & Western Ry. Co., and the Kanawha & Michigan Ry. Co.

Sullivan and Dustin, JJ., concur.

---

ON REHEARING, JULY 21, 1909.

U. G. Denman, Atty. Gen., F. T. Eagleson and E. C. Morton, for plaintiff.

J. H. Hoyt and Doyle, Lewis & Shauffelberger, for defendant.

ALLREAD, J.

Upon application of counsel for the railway company a rehearing has been allowed upon two propositions, viz: The discontinuance of the guarantee of the coal companies, and the competing character of the K. & M. Ry. Co.

The propositions involved in the rehearing have been argued with great earnestness and ability by the respective counsel, both orally and by supplemental briefs.

These questions were somewhat overshadowed in the former decision, by the main question of the right of the railway company, to hold the stock of the subsidiary coal companies, and the court has therefore reviewed and considered these propositions anew, in view of their importance and in the light of the present argument.

The "commodities clause" decision, which was announced by the Supreme Court of the United States, pending this re-hearing, has been cited for its bearing upon the question of the bond guaranty and has been considered by the court upon the main question of stock ownership in the coal companies.

The court is of opinion that the "commodities clause" case involved the application of different principles and may therefore, be distinguished from the case at bar.

The railway companies there, had the charter power, expressly granted and held valid by the state, to hold the coal company stocks, and the act of congress was in derogation of the power so granted by the state. In view of its conflict with the rights granted and held valid by the state, and of defeated amendments during the passage of the act, expressly forbidding stock ownership in subsidiary companies, the court applied a strict construction of the "commodities

State v. Railway.

clause,'' so as to avoid grave constitutional questions and preserve as far as possible the state charter.

In the case at bar the state denies the power and the court is called upon to construe the charter at the suit of the state granting it. The uniform rule of construction in cases of this kind is to resolve all doubt in favor of the state and against the grantee.

This is the uniform trend of the Ohio cases. Taft, J., in *Humboldt Min. Co.* v. *Manufacturing, Min. & Mill. Co.* 62 Fed. Rep. 356, 361 [9 O. F. D. 153; 10 C. C. A. 415], says:

"There is no court in the country which has been stricter in enforcing the principle that corporations are prohibited from exercising any powers which are not expressly conferred upon them in their charters, or which are not fairly incidental to the express objects of their creation, than the Supreme Court of Ohio.''

The doctrine is aptly stated by Mr. Justice Brewer, sitting in circuit in the case of *Chicago, R. I. & P. Ry.* v. *Railway,* 47 Fed. Rep. 16, 22:

"All grants, even grants of corporate franchises, are construed strongly in favor of the government, and against the grantee. So when the state challenges the action of one of its corporate creations, it may insist on clear warrant for such action.''

We think the distinction between the principles applicable here, and those of the "commodities'' case clearly warranted. But even if the "commodities'' case be in conflict and incapable of reconciliation, the court is bound to follow the decisions of our own state, where, as in this case, no federal question arises, and where only state statutes and policies are involved.

In this connection the case of *Stockton* v. *Railway,* 50 N. J. Eq. 52 [24 Atl. Rep. 964; 17 L. R. A. 97], may be cited as strikingly similar to the case at bar. The claim was there made, as here, that the ownership of a majority of the capital stock of the coal companies by a railway company did not vest the railway company with the ownership nor control of the coal companies, and the claim was characterized by the chancellor as a "disguise and evasion.'' And as to the monopoly formed by the union of the coal and railway companies, said:

"The commodity in which these three companies deal is a necessary of life in this state. It is the principal fuel of its homes and factories. The slightest increase in its price is felt by a population of hundreds of thousands of persons, for their necessity compels them

13 O. C. C. Vol. 31

Franklin County.

to pay that increase. If once a complete monopoly is established by the destruction of competition, whether that be through lease or by co-operation, the promoters of it and sharers in it may have whatever prices their cupidity suggests. The disaster which will follow cannot be measured. It will permeate the entire community,—furnaces, forges, factories, and homes,—leaving in its trail murmurings of discontent with a government which will tolerate it, and all the evil effects of oppression.''

It is urged by the counsel for the railway company that the guaranty of the bonds of the coal companies, and the contract between the railway company and the Continental Coal Co. for the equal division of the shipments, is a proper and authorized method of obtaining business and therefore within the charter of the railway company as an implied and incidental power.

Tonnage contracts, as such and without other features, have been generally if not universally upheld. The following cases to that effect are cited by counsel for the railway company: *Cleveland & M. Ry.* v. *Furnace Co.* 37 Ohio St. 321 [41 Am. Rep. 509]; *Interstate Commerce Com.* v. *Railway*, 209 U. S. 108 [52 L. Ed. 705]; *Jacksonville, M. P. Ry. & Nav. Co.* v. *Hooper*, 160 U. S. 514 [16 Sup. Ct. Rep. 379; 40 L. Ed. 515]; *Bald Eagle Val. Ry.* v. *Railway*, 171 Pa. St. 284 [33 Atl. Rep. 239; 29 L. R. A. 423; 50 Am. St. Rep. 807]; *Lough* v. *Outerbridge*, 143 N. Y. 271 [38 N. E. Rep. 292; 25 L. R. A. 674; 42 Am. St. Rep. 712]; *Temple St. Cable Ry.* v. *Hellman*, 103 Cal. 634 [37 Pac. Rep. 530]; *Old Colony Railroad Corp.* v. *Evans*, 72 Mass. (6 Gray) 25 [66 Am. Dec. 394].

In *Cleveland & M. Ry.* v. *Furnace Co.* supra, the question of discrimination was eliminated by the finding of the jury in the trial court, and the contract was upheld as a tonnage contract. The question of public policy and the rights of the public were not involved in the case as presented in the Supreme Court.

In the case of *Interstate Commerce Com.* v. *Railway*, supra, the decision was based upon the finding that the rate in question had been fixed upon actual genuine competition and in good faith. The question raised by the interstate commission, was, whether it was proper to fix a different rate for live stock than upon packed beef. And upon the finding as to competition it was held that a different rate in a different class did not affect the validity of the rate so fixed upon actual competition in the same class. In none of the other cases cited does the question of public policy arise.

Now, is the contract for the guaranty of the coal company bonds,

and the equal division of the shipments of the Continental Coal Co. merely a tonnage contract?

In one view it may be said that the guaranty of the bonds was to enable the coal company to obtain more money, to buy more mines and ship more coal. But in a broader sense and in the view evidently adopted by the railway company the underlying and dominant feature was the control of the coal production and transportation and the ultimate restriction of competition. This was the declared purpose of the promoters of the reorganization and the evident result.

The written contract of the Continental Coal Co. was first made with the T. & O. C. Ry. Co. This contract standing alone, might, with some plausibility, be said to be one of tonnage. But under a permissive clause of that contract, the Hocking Valley, a competing company, is brought in by a contract between that company and the T. & O. C. Co. providing for a joint guaranty of the bonds of the Continental Coal Co. and an equal division of the traffic.

We do not see how the conclusion can be escaped that such an agreement between naturally competing railway companies tends to monopoly and leads to discrimination. The vice of illegality taints and vitiates the contract and renders the transaction void as against the state. The charter of the defendant was granted and extraordinary powers conferred for the public good and it should not, therefore, be used to accomplish an unlawful purpose.

It is contended that all public purposes are accomplished by forbidding the stock holding and that it is not necessary nor competent to terminate the bond guaranty, which has been executed and is outstanding.

This question has given the court a great deal of trouble. But our conclusion is, that the guaranty being an unlawful exercise of power and that a complete separation of interest and identity cannot be had while the guaranty exists, and the railway company remains interested in the financial operation of the coal company and while the coal company's stock is pledged with the fiscal agents of the railway company, the state has the right to have the whole relationship severed. It is no defense to the railway company to plead the rights of third parties, nor that the illegal act has been executed.

The court agrees with counsel, that it has no jurisdiction to determine in this action the rights of the bondholders. The suggestion in the original opinion as to the validity of the bonds as against the property of the railway company was employed in an effort to distinguish the decision by Lurton, J., in *Central Trust Co. of N. Y. v.*

*Railway*, 10 O. F. D. 328 [87 Fed. Rep. 815], from the case at bar. It is clear to the court that the rights of the bond-holders can only be determined when an appropriate suit is brought, wherein they are made parties. Whether, therefore, the bondholders can exact of the railway company the full amount with interest to maturity, or whether the vice of *ultra vires* affects the validity of the bonds, is not now for decision. But as against the railway company, the state has the right to call upon the defendant, as an alternative to save its charter, that it purge itself of the illegal act.

It is also urged that the portion of the contract providing for an equal division of the tonnage of the Continental Co., is not set out in the amended petition as a foundation for relief. But we think the tenth cause of action as to the agreement for discrimination between all the railway and coal companies, reaches this issue.

It is contended that the Continental Co. and the railway companies being satisfied, the agreement should not be disturbed. The state, however, is not bound by the fact that the contracting parties are satisfied, but may inquire whether others and especially the public at large are prejudiced, or whether the contract tends to prejudice them. The tendency of this contract is toward discrimination against other operators in whom the railway company is not interested and through such discrimination to affect the body of consumers.

Taking up the question of the competitive character of the K. & M. Railway and the Hocking Valley Railway, it may be conceded that if Athens be accepted as the terminus of the Hocking Valley, and the K. & M. be considered independently of its connections, there would be little support for the claim that the two railways are competing lines. But we think the view may be somewhat enlarged, and treated upon a more practical basis.

The charter of the Hocking Valley Co. describes its line as "extending from the city of Toledo, by way of Gallipolis to the city of Pomeroy, * * * together with all branches or sidings of said railroad."

From the charter, therefore, as well as the general situation disclosed by the evidence, it appears that the main line of the Hocking Valley extends from Toledo to the Ohio river, and that the extension to Athens is a branch.

The K. & M. charter describes the initial terminus of its railway as the village of Corning, and thence extending by way of Jacksonville, Athens and Middleport to the Ohio river at Point Pleasant, and into West Virginia, by way of Charleston to the Gauley river.

### State v. Railway.

It may fairly be assumed that the chief commercial importance of the village of Corning as a starting point of a railway was, its being the terminus and connecting point of the T. & O. C. railroad. The K. & M. railway is a coal carrying road, extending from the Hocking Valley district to the Kanawha district of West Virginia, and reaching the markets through its connections, largely, the T. & O. C. The K. & M. railway was, naturally, adopted by the T. & O. C. Co. as a connecting branch, and the adoption made more permanent by the T. & O. C. Co. acquiring and owning a majority of its capital stock.

The T. & O. C. railway company was authorized by the letter and spirit of Sec. 3300 Rev. Stat. to acquire the stock of the K. & M. Company, as they were not competing but connecting and continuous lines, and extended thereby the competitive influence of the T. & O. C. from Corning through the coal district to Athens and the Ohio river. This acquisition of stock by the T. & O. C. Co. and its virtual ownership and control of the K. & M. was not only legal, but subserved the public interest by extending the field of competition.

It is claimed that the trackage contract between the Hocking Valley Co. and the K. & M. for the joint use of the track along the Ohio river between Gallipolis and Pomeroy, which contained a clause forbidding the K. & M. taking any business off the Hocking Valley lines to, or from, any point on the Hocking Valley lines, except Athens, so limited competition along the Ohio river, as to leave nothing substantial between the two companies. There is some obscurity as to whether the K. & M. had the right to take business off the Hocking Valley lines for the T. & O. C. connection and points beyond. Mr. Conners, superintendent of both railways, states that the K. & M. with the T. & O. C. connections was in competition with the Hocking Valley at Ohio river points and at Athens, for Columbus, Toledo, and intermediate points. And we are of opinion that it fairly appears from the evidence, especially from the fact of the K. & M. line touching the Ohio river at Point Pleasant, and coming near at Hobson, that the K. & M. was in a position, independent of the trackage, to compete with the Hocking Valley for the business coming down the Ohio river, and also at Athens, for the markets of Columbus, Toledo and intermediate points accessible to both railways.

While the K. & M. and T. & O. C. were connected by stock ownership, and operated in alliance, a shipper at Athens or upon the Ohio river, had a choice of routes and the benefit of competition. By the transfer of the majority of the stock of the K. & M. from the T. & O. C. to the Hocking Valley, all competition from the Ohio river and

across southern Ohio to the T. & O. C. connection was swept away and all that territory brought under the influence of the Hocking Valley alone. The purchase by one railway company of the majority or controlling stock of another is tested as to its validity, by Sec. 3300 Rev. Stat., which authorizes such ownership when the lines are connecting and noncompeting. The acquisition of this stock by the Hocking Valley from the T. & O. C. is not within the permissive authority of the statute, nor sanctioned by public policy, because the K. & M. Ry. considered with reference to its T. & O. C. connection, was a competitive road with the Hocking Valley, and the act of the Hocking Valley in the acquisition of said stock was illegal.

In *Hafer* v. *Railway*, 4 Dec. 487 (29 Bull. 68), the C. J. & M. Ry. Co. was declared to be a competitor of the C. H. & D. Ry. Co. between Cincinnati and Toledo, although the former depended for its entrance into Cincinnati upon a trackage arrangement, temporary in its nature.

In the *East Line & R. R. Ry.* v. *State*, 75 Tex. 434 [12 S. W. Rep. 690], the finding of fact entered by the trial court was, that disregarding connections with other lines, those involved in the purchase were not competing, but with reference to the connections they were competitive. Upon this finding the court held the railways were competitive lines.

Still more nearly in point is the case of *State* v. *Railway*, 21 Mont. 221 [53 Pac. Rep. 623; 45 L. R. A. 271], where the connections were considered in determining the question of competition.

The broader and more practical view of competition adhered to in the cases cited, has been established as the rule of this state in *State* v. *Vanderbilt*, 37 Ohio St. 590.

The claim is made that the rule of public policy in this state has been supplanted by the state railway commission act. On the other hand, it is claimed that the commission act is supplemental to the existing laws. We do not find it necessary to express an opinion on this subject, as the offenses were committed and the suit brought before the passage of the act.

We therefore conclude that the K. & M. Ry. Co. in its broader and more practical sense is a competing road with the Hocking Valley. And that the Hocking Valley Co. did not have the right to acquire and hold the majority stock of that railway company.

The former decision is therefore adhered to.

**Sullivan** and **Dustin, JJ.,** concur.